IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-1071-PAB-STV

D.B, and
G.H.

      Plaintiffs,

v.

GRIFFITH CENTER FOR CHILDREN INC., a Colorado Corporation;
TANIA SOSSI, an Individual;

      Defendants.

---

### RESPONSE TO MOTION TO DISMISS

Plaintiffs bring claims arising out of the sexual abuse they suffered while they were involuntarily placed at the Griffith Centers for Children ("GCC"). *See generally Complaint*, ECF No. 1. Defendants move to dismiss Plaintiffs' first, second, third, fifth, and sixth claims for relief. *See generally Motion to Dismiss ("MTD")*, ECF No. 22. For the following reasons, the Court should deny Defendants' motion.

**I.    LEGAL STANDARD**

In deciding a motion to dismiss, courts must "assume the truth of all well-pleaded facts in the complaint, and draw all reasonable inferences therefrom in the light most favorable to the plaintiff[]."[1] *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009). In that light, a complaint survives "if it alleges a plausible claim for relief—that is, the factual allegations

---

[1] Defendants intersperse their Motion with denials of certain facts that appear intended to cast doubt on the merits of Plaintiffs' claims. Such factual disputes are nothing more than unsupported statements of defense counsel and are not properly before the Court.

must be enough to raise a right to relief above the speculative level." *Id.* (quotation marks and citations omitted). Indeed, the plausibility standard "does not require that [the] [p]laintiff establish a prima facie case in the complaint." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). And "granting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias*, 567 F.3d at 1178; *see also Quintana v. Sante Fe County Bd. of Com'rs*, 973. F.3d 1022, 1034 (10th Cir. 2020) (holding that "the plaintiffs alleged enough to explore their *Monell* claim in the discovery process" given "the low bar for surviving a motion to dismiss").

## II.   ANALYSIS

### A.  Claim One – Title IX

Plaintiffs bring a claim under Title IX violation against Defendant GCC. *See* ECF No. 1 at 19-20, ¶¶ 154-64. Title IX prohibits sex-based discrimination by education programs that receive federal funding. 20 U.S.C. § 1681(a). Defendants make four conclusory arguments: (1) Plaintiffs have not supported their claim that GCC received federal financial assistance; (2) Plaintiffs have not alleged that GCC discriminated against them based on their sex; (3) Ms. Olivia is not a teacher, and the abuse did not occur during school hours; and (4) Plaintiffs failed to adequately plead that GCC had actual knowledge of Ms. Olivia's abuse. *See* ECF No. 22 at 5-6.

Defendants provide no support for these arguments. On this basis alone, the Court should deny the motion with respect to claim one. *See United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider . . . issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation."); *United States v. Dunkel*, 927 F.2d

2

955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Halik v. Darbyshire*, No. 20-cv-01643-PAB-KMT, 2021 WL 4305011, at *4 (D. Colo. Sept. 22, 2021) (upholding magistrate judge finding that defendants' qualified immunity analysis was too "meager and perfunctory" to be considered adequately presented). However, should the Court consider each "argument" presented by defendants, they fail for the following reasons.

### i. The GCC Receives Federal Financial Assistance

Plaintiffs' Complaint alleges that, "[a]t all relevant times, Defendant GCC received federal financial assistance." ECF No. 1 at 19, ¶ 156. Defendants argue that this is a conclusory allegation and adds in a footnote that "Defendant Griffith Centers denies that it receives any federal funding under Title IX." ECF No. 22 at 6 n.2. Plaintiffs' allegation is a well-pled factual allegation that the Court must accept as true for the purposes of a motion to dismiss. Defendants' unsupported statement in its motion that it does not receive "any federal funding under Title IX" is insufficient to rebut this allegation and is an assertion outside the contents of the Complaint that the Court must not consider.[2] Additionally, Title IX does not require the receipt of federal funds "under Title IX." *See Karanik v. Cape Fear Acad., Inc.*, 608 F. Supp. 3d 268, 280-84 (E.D.N.C. 2022) (holding that private high school received federal financial assistance and was thus subject to Title IX when it obtained loan through the Paycheck Protection Program (PPP) established pursuant to the Coronavirus Aid, Relief, and Economic Security Act (CARES Act));

---

[2] To the extent the Court considers the substance of the GCC's extraneous argument that it does not receive federal funds, its filings with the IRS belie this argument. GCC's Form 990 for the IRS states that its "Reason for Public Charity Status" is because it is "[a]n organization that normally receives a substantial part of its support from a governmental unit or from the general public described in section 170(b)(1)(A)(vi)." **Exhibit 1,** *2019 GCC IRS Form 990*, at 17. GCC had $5,110,414 in program revenue from Colorado state agencies and $2,809,695 from Medicaid. *Id.* at 9. For the state fiscal year 2019-2020, federal funds and reappropriated funds made up 57% of Colorado's Medicaid budget. **Exhibit 2**, *Health First Colorado Budget*, at 1. As such, Defendant GCC clearly avails itself of federal funding within the meaning of Title IX.

3

34 C.F.R. § 106.2(g) (defining "federal financial assistance," to include "[a] grant or loan of Federal financial assistance" and "[a]ny other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty."). In other words, contrary to Defendants' suggestion, there is no requirement that federal funding be earmarked for Title IX specifically to satisfy this element.

### ii. Plaintiffs Suffered Sex-Based Discrimination

Defendants' second argument is that Plaintiffs do not allege any sex-based discrimination. But Ms. Oliva's sexual assaults of Plaintiffs are plainly acts of sex discrimination under well-settled law. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 581 (1998) (stating that a teacher's "sexual [ ] harassment and abuse[ ][of] a student" constitutes "discriminat[ion] on the basis of sex." (citing *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992)); *Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d 1300, 1311 (10th Cir. 2020) ("[T]he sexual assault that [plaintiff] complained about was an act of sex discrimination."); *Day v. Career Bld. Acad.*, No. 18-cv-00837-RM-KMT, 2021 WL 4260797, at *6 (D. Colo. Sept. 20, 2021) ("Sexual assault may be an act of sex discrimination."); *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 750 (2d Cir. 2003) ("'Discrimination' for purposes of Title IX liability, is not limited to disparate provision of programs, aid, benefits or services or inequitable application of rules or sanctions. It has, instead, been recognized as also encompassing teacher-on-student hostile educational environment sexual harassment." (internal citations omitted)); *Chancellor v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 708 (E.D. Pa. 2007) ("Unwelcome sexual conduct constitutes a sexually hostile educational environment, a form of sexual harassment. And sexual harassment constitutes discrimination on the basis of sex. Thus, a teacher who has sex with a high school student who is assigned to his class discriminates against the student on the basis of

4

sex in violation of Title IX."). Ms. Oliva's sexual abuse of plaintiffs constituted sex-based discrimination under Title IX.

### iii. Ms. Oliva's Abuse is the Type of Abuse Covered by Title IX

Defendants argue that they are not liable under Title IX because Ms. Oliva was not a teacher and the abuse did not occur at school during school hours. *See MTD*, ECF No. 22 at 6. However, a funding recipient is liable under Title IX where "the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999). "[T]hese conditions are satisfied most easily and most obviously when the offender is an agent of the recipient." *Id.* Ms. Oliva was an employee of GCC who used her position as a staff member to gain access to plaintiffs. *See Complaint*, ECF No. 1 at 4, 6, ¶¶ 18, 33-34. Much of Ms. Oliva's sexual abuse of plaintiffs took place at the GCC residential facility. *See id.* at 7-13, ¶¶ 24-100. The GCC residential facility and the school are not separate organizations but part of the same program, with the school operating under the umbrella of GCC. The fact that Ms. Oliva was not a teacher, and the abuse did not take place at the school (which is located across the street from the residential facilities) is immaterial. *See Monroe County Bd. Of Educ.,* 526 U.S. at 645 (finding that an educational institution "may be liable for subjecting their students to discrimination where the [institution] is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority.")

GCC is a federal funding recipient subject to Title IX. *See Complaint*, ECF No. 1 at 19, ¶ 156. Ms. Oliva is an employee of GCC who used her position as a GCC residential staff member to sexually abuse plaintiffs who were receiving educational services at the program. *See generally id.* GCC had control over both the abuser (Ms. Oliva) and the location of much of the

5

abuse (GCC residences). Accordingly, GCC can be held liable for Ms. Oliva's abuse. *Cf. Doe v. Fournier*, 851 F. Supp. 2d 207, 220-21 (D. Mass. 2012) (finding that adult was acting "under color of state law" when he "enjoyed the opportunity to harass Plaintiff and solicit sex from her by virtue of the authority he had as a high school guidance counselor and football coach. The fact that some of the relations he had with Plaintiff took place after school and not on school property does not change the fact that he was 'clothed with the authority of state law' at the time.").

### iv. Defendants had Knowledge of the Abuse and Were Deliberately Indifferent to the Abuse

Defendants conclusory assert that Plaintiffs failed to show that Defendant GCC had actual knowledge to Ms. Oliva's sexual harassment or that Defendant GCC was deliberately indifferent. Defendants fail to make any argument or cite any case law in support of this assertion.

In contrast to Defendants' barebones assertion that these Title IX elements were not sufficiently pled, the complaint provides numerous allegations that GCC had actual knowledge of Ms. Oliva's sexual harassment of GCC residents.[3] *See Complaint*, ECF No. 1 at ¶¶ 40-46, 49-51, 58, 81-84, 89-90, 97-100, 101-53. Such allegations include that, in December 2019, F.B. informed Deanna Cantwell, a GCC employee, that Ms. Oliva had been supplying him with cocaine, sending inappropriate pictures to him, and engaging him sexually. *Id.* at 15, ¶¶ 117-18. Ms. Cantwell informed Erin Locket, the GCC Human Resources Director, of Ms. Oliva's

---

[3] In the Tenth Circuit, actual knowledge is shown where an educational provider is aware of "a substantial risk of abuse to students." *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1154 (10th Cir. 2006).

inappropriate relationship with F.B., who in turn told Defendant Tania Sossi.[4] *Id.*, ¶¶ 121-22. Defendant Sossi told Ms. Locket to ignore Ms. Cantwell's complaints and took no meaningful investigatory action. *Id.* at 26, ¶ 123. After Defendant Sossi refused to take any action, Ms. Cantwell spoke to other GCC residents to learn more about the situation. *Id.*, ¶ 125. Ms. Cantwell learned that Ms. Oliva's sexual relationships with residents was common knowledge. *Id.*, ¶ 128. Ms. Cantwell reported this information on a near-weekly basis to Ms. Lockett, who reported these concerns directly to Defendant Sossi. *Id.*, ¶¶ 129-30. Rather than investigate Ms. Oliva, Defendant Sossi told Ms. Locket to order Ms. Cantwell to stop speaking to residents about these issues. *Id.*, ¶ 131.

Additionally, G.H. told Ms. Cantwell that Ms. Oliva took boys to the park, he had smoked marijuana with her there, and they had "wrestled around." *Id.* at 17, ¶ 135. Ms. Cantwell again reported this to Ms. Lockett and again nothing was done. *Id.*, ¶ 137. After coaxing, G.H. agreed to come speak to Ms. Lockett about his relationship with Ms. Oliva. *Id.*, ¶ 140. However, the day of the meeting, GCC terminated Ms. Cantwell on Defendant Sossi's orders. *Id.* at 18, ¶¶ 144-48.

These allegations clearly show that Defendant Sossi, an appropriate person with authority to take corrective action to end the discrimination, had actual knowledge of Ms. Oliva's sexual abuse, continuously refused to take any meaningful corrective action despite mounting reports, and eventually terminated the whistleblower employee instead of the harasser. These allegations are more than sufficient to satisfy actual knowledge and deliberate indifference.

### B. Claim Two – Fourteenth Amendment

---

[4] Defendants assert that Defendant Sossi was the Chief Operating Officer (COO) at the time, not CEO. Either way, Defendants do not argue, nor could they, that Defendant Sossi was not an "appropriate person" within the meaning of Title IX.

Plaintiffs' second claim is for a violation of the Fourteenth Amendment right to bodily integrity. *See Complaint*, ECF NO. 1 at 20-23, ¶¶ 165-87. Defendants make two arguments: (1) GCC is not a state actor, and (2) the Complaint fails to state a claim.

### i. The GCC is a State Actor

GCC is a state actor for purposes of § 1983. The state action doctrine requires a fact-intensive inquiry, with the overarching question being whether the challenged action is "fairly attributable to the State." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982). Accordingly, courts have adopted a flexible approach to the state action doctrine, considering whether, for instance: (1) "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself[;]" (2) the State has "so far insinuated itself into a position of interdependence" with the private party that there is a "symbiotic relationship" between them; (3) a private party is "a willful participant in joint activity with the State or its agents[;]" or (4) a private entity exercises "powers traditionally exclusively reserved to the State[.]" *See, e.g.*, *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (internal citations omitted).

In the context of privately-operated, government-contracted institutions, such as the GCC, courts place great weight on two factors as determinative of state action: (1) a relationship between the challenged conduct and the private actor's contracted-for service; and (2) whether children were involuntarily placed in the defendant institution.[5]

---

[5] These factors are always accompanied by traditional indicia of state action, including receipt of state funding, significant state regulation, and whether the entity performs a function that has been "'traditionally the *exclusive* prerogative of the State.'" *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) (emphasis in original) (internal citations omitted).

### *a. Relationship Between Conduct and Contracted-for Services*

In *Milonas v. Williams*, 691 F.2d 931 (10th Cir. 1982), the Tenth Circuit held that a private school, which contracted with the State to educate minors with behavioral problems, was a state actor within the meaning of § 1983. The Tenth Circuit held that there was a sufficient nexus between the State's assignment of students to the school and the conduct of the school in relation to those students to support a theory of state action. *See id*. at 939-40.

Various courts have followed the reasoning of *Milonas*. For example, in *Scaggs v. New York Dep't of Educ*., the court held that where students claimed that a publicly-funded charter school failed to provide adequate special education programs and safe physical conditions, the charter school was "properly viewed as having engaged in state action[.]" 2007 WL 1456221, at *13 (E.D.N.Y. May 16, 2007).

> The claims relate to the alleged total inadequacy of a school to provide free public education to its students while receiving state funding, being bound to state educational standards and purporting to offer the same educational services and facilities as any other public school. Under these circumstances, the Court agrees with the district courts that have held, since *Rendell-Baker*, that claims addressing the nature and quality of education received at charter schools may be properly brought against such schools and their management companies under Section 1983.

*Id*. (emphasis added); *see also Magagna v. Salisbury Twp. Sch. Dist*., 1998 WL 961906, at *2 (E.D. Pa. Dec. 29, 1998) (holding that there was a sufficient nexus between the conduct of a non-profit operator of an alternative school program and a school district's assignment of students to consider the private school a state actor).

### *b. Plaintiff's Involuntary Placement at GCC*

Courts have treated children's involuntary attendance at a school or institution as decisively weighing in favor of state action. For instance, in *Milonas*, where the minor plaintiff

9

was involuntarily committed to the defendant school as a condition of his probation imposed by a juvenile court, the Tenth Circuit held that the school, which received public funds and operated as a mental health, correctional, and detention facility, was a state actor. *See* 691 F.2d at 939*; see also Magagna*, 1998 WL 961906, at *2 (holding that the private operator of an alternative school was a state actor where the school district assigned the Plaintiff to the alternative school).

Plaintiffs did not choose to be placed at the GCC. *See Complaint*, ECF No. 1 at 5, 10, ¶¶ 24, 67. The involuntary nature of their placement at Griffith Center is even more pronounced than the *Milonas* plaintiffs' placement at the Provo Canyon School. There, even though Timothy Milonas, Jr.'s mother elected to place him in the Provo Canyon School, the Tenth Circuit found that he was "involuntarily committed[.]" *See Milonas*, 691 F.2d at 936.

Plaintiffs allege their involuntary placement in GCC, which performed traditional functions of the state. Accordingly, GCC can be sued as a state actor under 42 U.S.C. § 1983.[6]

### ii. Plaintiffs State a Claim Against the GCC

Defendants' next argument is that the complaint does not allege a custom, policy, or practice of GCC that was a moving factor behind plaintiffs' constitutional violations. *See MTD*, ECF No. 22 at 9. GCC is liable for Ms. Oliva's constitutional violations because "a municipal

---

[6] Defendants additionally argue that certain of Plaintiffs' factual allegations regarding the Colorado Division of Youth Services ("DYS") are incorrect. *See MTD*, ECF No. 22 at 8. First, Defendants' motion is based on Rule 12(b)(6) which requires the Court to accept plaintiffs' well-pled facts as true. Second, defendants' provide a link to a DYS website that was altered after the filing of the complaint. *See id.* The attached screenshotted versions of the DYS website from April 27, 2023 shows that the DYS website formerly contained a "directory of private contract programs" that included the GCC on its list. **Exhibits 3,** *2022.04.27 CDHS Website*, **4,** *2023.04.28 CDHS Website*, **5,** *List of Providers*. Defendants' motion to dismiss is highly misleading as it relies on a website altered after the filing of the complaint to remove the list containing the GCC as a private contract program.

policy or custom was the moving force" behind the violations of plaintiffs' constitutional rights.[7] *Myers v. Bd. of Cnty. Comm'rs of Okla. Cnty.*, 151 F.3d 1313, 1316 (10th Cir. 1998). The Tenth Circuit has instructed:

> A municipal policy or custom may take the form of (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks and alterations omitted). Here, GCC's municipal liability arises from its failure to adequately supervise or investigate Ms. Oliva and because of its deliberate indifference to the injuries that resulted from this failure to supervise or investigate.

The facts here show that the GCC failed to provide adequate supervision of Ms. Oliva, to whom Griffith Center allowed "full control" over all Griffith Center children, despite the fact that it knew of her troubling behavior towards minors. *See Complaint*, ECF NO. 1 at ¶¶ 47, 74, 78. D.B.'s therapist at the GCC in addition to many staff members knew of D.B.'s encounters with Ms. Oliva. *Id*. at ¶ 59. When Ms. Oliva was finally prevented from taking the boys to the park alone or when she was removed from her night shift at Avalanche, it was because someone in a position of power at the GCC found it necessary to limit her interaction with the boys. *Id*. at ¶ 51, 97. However, despite such measures, the GCC failed to meaningfully investigate Oliva's interaction with the boys and allowed her to remain as a staff member. GCC's failure to take the

---

[7] Defendants do not dispute that Plaintiffs did indeed suffer constitutional violations, and Plaintiffs accordingly do not address this issue.

most basic measures to keep the children safe from Ms. Oliva forms the basis of municipal liability.

GCC's liability can be established under both a failure-to-supervise theory and under a failure-to-train theory. Courts apply the same reasoning in evaluating failure-to-train claims and failure-to-supervise claims. *Zartner v. City & Cty. of Denver, Colorado*, 242 F. Supp. 3d 1168, 1173 (D. Colo. 2017). Where a municipality fails to supervise its employees on matters of obvious constitutional importance, the failure to supervise may be characterized as deliberate indifference even in the absence of any prior incidents. *See Moore v. Miller*, No. 10-cv-00651-JLK, 2014 WL 2207346, at *7 (D. Colo. May 28, 2014) (recognizing that "the need to train officers in the constitutional limitations on the use of force, [is] 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights) (internal citations omitted).

In this case, GCC's supervision of Ms. Oliva was woefully inadequate, if not entirely lacking. Ms. Oliva had carte blanche over the boys at GCC. GCC also failed to timely investigate and discipline Ms. Oliva when it did become aware of her actions. GCC opted to simply add another employee on walks, failing to investigate what Ms. Oliva may be subjecting the boys to under her watch. As a result of GCC's failures, Ms. Oliva continued to supply the boys with contraband and subject plaintiffs to inappropriate sexual behavior and abuse.

The Tenth Circuit has noted that "failure to investigate or reprimand might also cause a future violation by sending a message to officers that such behavior is tolerated." *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009). In this case, had Ms. Oliva been timely investigated and disciplined by the GCC after it was noticed that she was acting inappropriately with the resident boys, she would not have been able to continue her sexual encounters with

12

plaintiffs and precipitate their downward spiral through drugs, which she provided them with. *Ortega v. City & Cnty. of Denver*, 944 F. Supp. 2d 1033, 1040 (D. Colo. 2013) ("A reasonable juror could also find that, had Nixon been disciplined as a result of that investigation, he would not have been present to inflict the harm alleged by Plaintiffs in this case.").

Because GCC entrusted Ms. Oliva with caring for vulnerable children, its failure to supervise or investigate her had the obvious and predictable result that Plaintiffs' constitutional rights would be violated. It is plainly obvious that adults tasked with caring for vulnerable children with histories of troubled behavior require adequate supervision. Yet, GCC placed the care of the GCC children in the hands of Ms. Oliva, whose control over said children was practically unchecked. Ms. Oliva subsequently abused her control to sexually assault and rape Plaintiffs.

### iii. Plaintiffs State a Claim Against Defendant Sossi

Defendants argue that Defendant Sossi cannot be held liable under § 1983 because the Complaint fails to show that she was deliberately indifferent. *See MTD*, ECF No. 22 at 11. The factual allegations Defendants include in their own motion, *see id.* at 11-12, show that the Complaint states a claim.

"[T]he three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities [are]: (1) personal involvement[,] (2) causation, and (3) state of mind." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). Defendants make no argument that the first and second elements are not met, *see MTD*, ECF No. 22 at 11, and Plaintiffs accordingly do not address them. With respect to state of mind, "a local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will

13

almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Burke v. Regalado*, 935 F.3d 960, 997-98 (10th Cir. 2019).

Defendant Sossi's "response" to the allegations of Ms. Oliva's abuse was clearly unreasonable. *See J.M. ex rel. Morris v. Hilldale Indep. Sch. Dist. No. 1-29*, 397 F. App'x 445, 454 (10th Cir. 2010) (unpublished) (finding jury could conclude that school responded unreasonably when it did not conduct investigation); *Vance v. Spencer County Public Sch. Dist.*, 231 F.3d 253, 260-61 (6th Cir. 2000); ("Although no particular response is required, and although the school district is not required to eradicate all sexual harassment, the school district must respond and must do so reasonably in light of the known circumstances."); *Doe v. School Admin. Dist. No. 19,* 66 F. Supp. 2d 57, 64 (D. Me. 1999) (concluding that a jury could find unreasonable a principal's failure to question the teacher or other students about allegations that the teacher was having sexual relations with a student). Defendant Sossi did not investigate Ms. Oliva after learning that F.B. had received cocaine and explicit photos from Ms. Oliva and was engaging with her sexually. *See Complaint*, ECF No. 1 at 15-16, ¶¶ 117-123. This continued as Ms. Cantwell provided more and more information regarding Ms. Oliva's abuse of residents to Ms. Lockett who then relayed such concerns directly to Defendant Sossi . *See id.* at 16-17, ¶¶ 118-40. Eventually, Defendant Sossi ordered the termination of Ms. Cantwell rather than investigate Ms. Oliva. *See id.* at 18, ¶¶ 144-153. Defendant Sossi's active refusal to investigate Ms. Oliva when presented with repeated information regarding sexual abuse of residents was deliberate indifference to the inevitable constitutional injury Plaintiffs suffered. Accordingly, the Court should deny Defendant Sossi's motion to dismiss the § 1983 claim against her.

**C. Claim Three – Actions for Sexual Misconduct Against Minors**

Colorado Revised Statute § 13-20-1202 provides a civil cause of action for sexual misconduct against a minor. It became effective on January 1, 2022, and was enacted as part of the Child Sexual Abuse Accountability Act ("CSAAA"), passed by the Colorado General Assembly in 2021. In *Aurora Pub. Sch. v. A.S.*, 2023 CO 39, ¶ 53 (2023), the Colorado Supreme Court held that "the CSAAA is unconstitutionally retrospective to the extent that it permits a victim to bring a claim for sexual misconduct based on conduct that predates the Act and for which previously available causes of action were time barred." However, the Court was careful to state that it was not holding the CSAAA unconstitutional in its entirety or that all claims were precluded by the retrospectivity clause. *Id.* To the contrary, the Court expressly stated that "[o]ur holding does **not** affect claims brought under the CSAAA for which the previously applicable statute of limitations had not run as of January 1, 2022." *Id.* (emphasis added). This is the case for plaintiffs.

Plaintiffs' claims tolled until they attained the age of majority. *See* Colo. Rev. Stat. § 13-81-103. Thereafter, Plaintiffs entered into a series of tolling agreements up to and including the date on which they filed suit.[8] As such, Plaintiffs' claims were not time barred as of the filing of the complaint. Accordingly, *Aurora Public Schools*' retrospectivity holding is inapplicable.

**D. Claims Five and Six – Negligence and Negligent Infliction of Emotional Distress**

Defendants argue that the Colorado Premises Liability Act ("PLA") provides the exclusive remedy for persons making a claim against a "landowner" in Colorado. *See MTD*, ECF No. 22 at 13. Therefore, according to Defendants, the Court should dismiss Plaintiffs' claims for

---

[8] While these tolling agreements are not included as allegations in the complaint, they are necessary to rebut defendants' argument that the statute of limitations has run.

negligence and negligent infliction of emotional distress ("NEID") because they are subsumed by the PLA. *Id.*

However, Defendants filed an Answer in addition to their Motion to Dismiss wherein Defendants deny that they are a "landowner" under the PLA. *Compare Complaint*, ECF No. 1 at 24, ¶ 197 ("Defendants are legally responsible for the activities conducted or circumstances existing on the real property where Plaintiffs were sexually assaulted, and therefore is a "landowner" as defined by C.R.S. § 13-21-115(1)."); *with Answer*, ECF No. 21 at 20, ¶ 197 ("Defendants deny the allegations contained in Paragraph 197 of Plaintiffs' Complaint.").

This Court recently confronted this issue in *Cereceres v. Walgreens*, No. 20-cv-03406-PAB-KMT, 2021 WL 4170457 (D. Colo. Sept. 14, 2021). In *Cereceres*, the plaintiff alleged that the defendant was the landowner, but the defendant denied this. *Id.* at *3. The defendant also argued, however, that the Court should dismiss the plaintiff's negligence claim because the PLA offered the exclusive remedy. *Id.* at *2. The Court rejected this argument.

> While defendant had the opportunity to admit landowner status and, as a result, dismiss plaintiff's negligence claim, defendant instead denies being a landowner – thereby removing itself from the scope of the PLA – while simultaneously arguing that it should not be subject to a common law negligence claim either. In other words, defendant effectively argues that there is no tort that governs the alleged conduct.

*Id.* at *3. At this stage, the Court should permit Plaintiffs' PLA as well as negligence and NEID claims to proceed in the alternative.[9]

### III.   CONCLUSION

---

[9] Plaintiffs additionally note that the complaint in *Cereceres* did not specifically state that the PLA and negligence claim were pled in the alternative. *See generally Cereceres*, No. 20-cv-03406-PAB-KMT, ECF No. 5 (D. Colo. Nov. 17, 2020).

For the foregoing reasons, each of Defendants' arguments fail. Defendants perfunctory raising of many issues warrants denial of their motion on that basis alone. Additionally, defendants frequently cite extraneous material despite bringing their motion pursuant to Rule 12(b)(6). Accordingly, Plaintiffs respectfully ask the Court to deny Defendants' Motion to Dismiss [ECF No. 22] in its entirety.

DATED: July 24, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Azra Taslimi*
Azra Taslimi
Matthew J. Cron
Siddhartha H. Rathod
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400 (t)
(303) 578-4401 (f)
at@rmlawyers.com
mc@rmlawyers.com
sr@rmlawyers.com

ATTORNEYS FOR PLAINTIFFS