IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 23-cv-01071-PAB-STV

D.B., and
G.H.,

      Plaintiffs,

v.

GRIFFITH CENTERS FOR CHILDREN INC., a Colorado Corporation, and
TANIA SOSSI, an individual,

      Defendants.

---

**ORDER**

---

This matter comes before the Court on Defendants' Motion to Dismiss Plaintiffs'
Complaint and Jury Demand Pursuant to F.R.C.P. 12(b)(6) [Docket No. 22]. The Court
has jurisdiction pursuant to 28 U.S.C. § 1331.

**I. BACKGROUND[1]**

This action arises out of plaintiffs' allegations that Viridiana Oliva, a residential
staff member employed by Griffith Centers for Children Inc. ("GCC"), sexually abused
plaintiffs while they were involuntarily housed at GCC. Docket No. 1 at 1. Plaintiffs
allege that defendants enabled Oliva's misconduct by failing to investigate, supervise, or
discipline her. *Id.* at 1-2. GCC operates a residential child care facility and contracts
with the Colorado Division of Youth Services to provide a variety of services related to

---

[1] The facts below are taken from plaintiffs' complaint, Docket No. 1, and are
presumed to be true, unless otherwise noted, for purposes of ruling on defendants'
motion to dismiss.

supervising, caring for, and rehabilitating children in the custody of the state.  *Id.* at 3, ¶ 7.  GCC operates several residential lodges, including the Avalanche Building and Transitional Skills Program ("TSP Building").  *Id.* at 5, ¶ 25 n.1.  GCC residents are required to attend the GCC school.  *Id.* at 3, ¶ 10.  GCC residential staff walk residents to and from school, stay in the classroom with the residents throughout the school day, and ensure that residents do their schoolwork in the evening.  *Id.* at 5-6, ¶¶ 28-31.

### A.  D.B.

In January 2019, D.B. was removed from his family and involuntarily placed at GCC, where he was housed in the Avalanche Building.  *Id.* at 5, ¶¶ 24-25.  He first met Oliva when she started working at GCC as a school staff member in Fall of 2019.  *Id.* at 4, 6, ¶¶ 18, 33.  Within days of meeting, Oliva began supplying D.B. with cigarettes, alcohol, and marijuana, which they would sometimes consume together.  *Id.* at 6, ¶ 34.  Although Oliva typically sold contraband to residents, she provided it to D.B. for free, which "made him feel special."  *Id.*  Oliva frequently sought out D.B. at the school and flirted with him during their encounters.  *Id.*, ¶ 33.  Oliva was later assigned as residential staff at the TSP Building, and, "[w]ithin a short period of time after her move to TSP, Oliva escalated the sexual nature of her encounters with D.B."  *Id.* at 6-7, ¶¶ 35, 37.  On one occasion, when Oliva and D.B. were in the hallway, Oliva "backed up into D.B., pushing her butt into his crotch.  She backed him in the wall of the hallway, gyrating her hips into him until he was erect.  She then turned around and started kissing him."  *Id.* at 7, ¶ 38.  Thereafter Oliva and D.B. often had physical encounters "with Oliva touching his penis through his clothes and guiding his hand into her vaginal area."  *Id.*, ¶ 39.

On one occasion, during a movie in the TSP lounge, Oliva sat on D.B.'s lap.  *Id.*, ¶ 41.  A GCC staff member named Noah looked in the TSP lounge window and observed Oliva sitting on D.B.'s lap.  *Id.*  A few minutes later, a staff member named Pam came into the lounge, saw Oliva sitting on D.B.'s lap, and immediately turned off the movie.  *Id.*  She reprimanded D.B. by sending him back to the Avalanche Building and ordered all the other boys to go to their rooms.  *Id.*  No one from GCC ever questioned D.B. about this incident.  *Id.*, ¶ 43.  Oliva was placed on administrative leave from GCC for several weeks after this incident and, upon returning, she told D.B. that she had not been at work because Noah was a "snitch."  *Id.* at 8, 14, ¶¶ 44, 109.

Within a week of her return, Oliva was transferred to the Avalanche Building from the TSP Building.  *Id.* at 8, ¶ 45.  For months, Oliva "would often take D.B. on walks alone where they would engage in sexual contact."  *Id.*, ¶ 46.  Oliva also routinely spent large portions of her shifts in D.B.'s room "engaging in kissing, sexual stimulation, and intercourse."  *Id.*, ¶ 47.  On one occasion, boys on the same floor as D.B. witnessed Oliva engaged in sexual intercourse with D.B. in his room.  *Id.*, ¶ 48.  On another occasion, Ashley, a GCC employee, saw Oliva walking out of D.B.'s room and ordered Oliva to complete the remainder of her shift at TSP.  *Id.*, ¶ 49.  No one from GCC ever questioned D.B. about Oliva's presence in his room that night.  *Id.*, ¶ 50.  Oliva later told D.B. that she was no longer allowed to take residents out for walks alone, but she "continued to engage sexually [with D.B.] in his room and within the Avalanche building."  *Id.*, ¶¶ 51-52.  In addition, Oliva "pressured D.B. to leave GCC at night so that they could spend more time together," as often as twice a week, even though it was against GCC rules.  *Id.* at 9, ¶¶ 53-54.

3

"Before his engagement with Oliva, D.B. was highly motivated to do well at GCC" and "determined to complete the program and reunite with his family." *Id.* at 10, ¶ 65. However, as a result of Oliva's abuse, D.B.'s academic and behavioral performance significantly declined, as he was "repeatedly written up for leaving campus without permission, his grades suffered, and he lost interest in school altogether." *Id.,* ¶ 66.

Plaintiffs allege that many GCC employees knew about Oliva's sexual contact with D.B. *Id.* at 9-10, ¶¶ 59-64. D.B.'s therapist, Teresa Meza, "asked D.B. 'how is the head' in reference to the oral sex he was receiving from Oliva" and "asked D.B. how he felt about girls sitting on his lap in reference to the incident in which Oliva was caught sitting on D.B.'s lap." *Id.* at 9, ¶¶ 59-60. Nikki Swanhart, a Residential Mental Health Technician at GCC, "indicated knowledge of the relationship between D.B. and Oliva. She often nodded her head disapprovingly whenever she saw him with Oliva." *Id.* at 10, ¶ 62. Danielle Stuut, a GCC Social Studies teacher, "expressed suspicion about Oliva, frequently questioning D.B. about the amount of time he spent with Oliva." *Id.,* ¶ 63. Deanna Cantwell, a behavioral therapist at GCC, would often "question D.B. about his relationship with Oliva" and "advise him to stay away from her." *Id.,* ¶ 64. Eugene Cherry, a case manager at GCC, told another student, Benjamin Moore, that D.B. had "confided in him about his relationship with Oliva." *Id.* at 15, ¶ 114. Plaintiffs allege that "it eventually became common knowledge at [GCC] that [D.B. and Oliva] were in a 'sexual relationship.'" *Id.* at 14, ¶ 106.

**B.  G.H.**

G.H. was ordered by a court to be placed at GCC and moved onto the campus in November 2019, where he was housed in the Avalanche Building. *Id.* at 10, ¶¶ 67-68.

4

G.H. met Oliva in January 2020 after she started working at the Avalanche Building.  *Id.* at 11, ¶ 69.  "G.H.'s interactions with Oliva started out flirtatiously."  *Id.*, ¶ 71; *see also id.*, ¶¶ 72-73, 75.  On one occasion, Oliva, G.H., and other boys were at a park and "Oliva jokingly tackled G.H. over a comment and they started to wrestle on the ground. The wrestling turned into touching, as Oliva ran her hand over G.H.'s crotch and pressed down, giving him an erection.  She then moved G.H.'s hands over her body, pressing his face into her breasts."  *Id.*, ¶ 76.  Oliva began going on walks with G.H. and providing him cigarettes, marijuana, dab pens, vapors, and alcohol.  *Id.*, ¶ 77.  "The more walks they went on, the more their physical contact increased, eventually leading to kissing and sexual touching."  *Id.* at 12, ¶ 79.  Staff would often notice the smell of marijuana and alcohol on G.H. after he returned from walks with Oliva, but GCC continued to permit G.H. to take unsupervised walks with her.  *Id.*, ¶¶ 80-81.  In addition, Oliva pressured G.H. to sneak out of GCC to see her, and GCC was written up on numerous occasions for leaving campus after hours.  *Id.*, ¶¶ 82-83.  However, no one questioned G.H. about where he went and who he was seeing.  *Id.*, ¶ 84.

Oliva purchased a phone for G.H., which G.H. and D.B. used to "send and receive sexually explicit messages with Oliva."  *Id.*, ¶¶ 85-87.  G.H. was caught with the phone on multiple occasions.  *Id.*, ¶ 88.  Although GCC "blamed" G.H.'s mother for providing the phone, G.H.'s mother was adamant that she had not done so and asked GCC to investigate how G.H. came to possess a phone.  *Id.*, ¶ 89.  No investigation was conducted.  *Id.*, ¶ 90.

Oliva "continued to escalate her sexual encounters with G.H."  *Id.*, ¶ 91.  "She would come into G.H.'s room and engage in kissing and touching," and performed oral

sex on him.  *Id.*, ¶¶ 91-92.  "While riding to a bowling event, Oliva chose to sit in the back of the bus with G.H. and D.B. on both sides of her.  She slid her hands inside their pants" and fondled their genitals.  *Id.* at 13, ¶ 94.  Noah "was driving the bus and G.H. noticed him staring at them from their rear-view mirror."  *Id.*, ¶ 95.

In the spring of 2020, Oliva "told G.H. that they needed to be more careful."  *Id.*, ¶ 97.  Oliva "informed [G.H.] that she was no longer allowed to take boys to the park by herself."  *Id.*  Noah and Casey, GCC employees, began to accompany Oliva to the park with the boys.  *Id.*, ¶ 98.  After Pierre, a GCC employee, saw Oliva in G.H.'s room one night, Oliva was never scheduled to work a night shift at the Avalanche Building again.  *Id.*, ¶¶ 99-100.

### C.  Ms. Cantwell

Deana Cantwell worked at GCC from May 2019 to February 2020.  *Id.* at 15, ¶ 117.  In December 2019, F.B., a resident, "informed Ms. Cantwell that Oliva had been supplying him with cocaine, sexting him via Snapchat on a phone she gave him, and engaging with him sexually."  *Id.*, ¶ 118.  Ms. Cantwell brought these allegations to Pierre's attention, but he "dismissed Ms. Cantwell's report, telling her that the resident must be lying and that there was nothing to be done."  *Id.*, ¶¶ 119-20.  Ms. Cantwell then relayed the information she had received from F.B. to the Human Resources Director, Erin Lockett.  *Id.*, ¶ 121.  Ms. Lockett communicated the information to Tanya Sossi, President and Chief Executive Officer of GCC.  *Id.*, ¶ 122.  Ms. Sossi "directed Ms. Lockett to ignore Ms. Cantwell's complaints and took no action to meaningfully investigate the allegations against Oliva."  *Id.* at 16, ¶ 123.  Ms. Lockett also told Ms.

Cantwell that the residents "were not to be trusted and without additional evidence there was nothing that could be done."  *Id.*, ¶ 124.

Ms. Cantwell then "began to conduct her own investigation and started to speak to other residents at GCC."  *Id.*, ¶ 125.  Ms. Cantwell learned that "all the residents knew that Oliva was someone who could provide them with contraband" and that "many residents knew of at least one resident who engaged with Oliva sexually."  *Id.*, ¶¶ 126-27.  Ms. Cantwell "realized that Oliva's illicit behaviors were common knowledge at the GCC campus."  *Id.*, ¶ 128.  Ms. Cantwell reported what the GCC residents had told her "on a near weekly basis," to Ms. Lockett, who would relay the information to Ms. Sossi.  *Id.*, ¶¶ 129-30.  Ms. Sossi "directed Ms. Lockett to stop Ms. Cantwell from speaking to the residents about these issues."  *Id.*, ¶ 131.  Ms. Lockett scheduled a staff meeting at which "the discussion focused on HIPAA requirements and how employees were prohibited from speaking to kids from different buildings and not to convey that information to others."  *Id.*, ¶¶ 132-33.  Plaintiffs allege that this was an "unmistakable message to Ms. Cantwell to cease communicating with residents about Oliva."  *Id.* at 17, ¶ 134.

Nevertheless, when G.H. told Ms. Cantwell that Oliva was taking the boys on walks to the park, that G.H. had smoked marijuana with Oliva while at the park, and that "he and Oliva had wrestled around," Ms. Cantwell reported it to Ms. Lockett.  *Id.*, ¶¶ 135-36.  Ms. Lockett again told Ms. Cantwell that the students at GCC "could not be trusted to tell the truth and there was nothing anyone could do without evidence."  *Id.*, ¶ 137.  Ms. Cantwell asked Ms. Lockett why Oliva was allowed to take residents on unsupervised walks despite GCC being aware of the concerns she had raised in the

past months, but "Ms. Lockett told Ms. Cantwell that this was Avalanche business and she had no right to question why they were doing things a certain way." *Id.*, ¶¶ 138-39. Plaintiffs allege that Ms. Lockett gave this response at Ms. Sossi's direction. *Id.*, ¶ 139. On Tuesday, February 25, 2020, Ms. Cantwell advised Ms. Lockett that G.H. was willing to talk to her about Oliva and that Ms. Cantwell would bring him to the HR office on Thursday. *Id.* at 18, ¶ 144. When Ms. Cantwell arrived at work on Thursday, she was told to report to Ms. Lockett, who terminated her and instructed her to leave the GCC campus immediately. *Id.*, ¶¶ 146, 148. Ms. Sossi had directed Ms. Lockett to terminate Ms. Cantwell's employment. *Id.*, ¶ 147.

After Ms. Cantwell's termination, GCC prohibited Oliva from taking residents on walks alone. *Id.*, ¶ 150. However, "[d]espite the multiple alarm bells raised by Ms. Cantwell, GCC refused to conduct any meaningful investigation, failed to conduct any monitoring or supervision of Oliva whatsoever, and refused to report the allegations to law enforcement as required by Colorado law." *Id.*, ¶ 151.

Plaintiffs bring six claims for relief: (1) violation of Title IX, 20 U.S.C. § 1681, et. seq., against GCC only; (2) violation of substantive due process under the Fourteenth Amendment pursuant to 42 U.S. § 1983; (3) violation of the Child Sexual Abuse Accountability Act ("CSAAA"), Colo. Rev. Stat. § 13-20-1201; (4) premises liability under Colo. Rev. Stat. § 13-21-115; (5) negligence; (6) negligent infliction of emotional distress/outrageous conduct. *Id.* at 19-26, ¶¶ 154-214.

On July 3, 2023, defendants filed a motion to dismiss. Docket No. 22. Defendants seek to dismiss plaintiffs' first, second, third, fifth, and sixth causes of action

under Rule 12(b)(6) for failure to state a claim.  *Id.* at 4-13.  Plaintiffs filed a response,

Docket No. 26, and defendants replied.  Docket No. 29.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege

enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . .

plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012)

(citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The court must "accept all

the well-pleaded allegations of the complaint as true and must construe them in the light

most favorable to the plaintiff."  *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th

Cir. 2007).  However, if a complaint's allegations are "so general that they encompass a

wide swath of conduct, much of it innocent," then the plaintiff has not stated a plausible

claim.  *Id.* at 1191 (quotations omitted).  Thus, even though modern rules of pleading

are somewhat forgiving, "a complaint still must contain either direct or inferential

allegations respecting all the material elements necessary to sustain a recovery under

some viable legal theory."  *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)

(alterations omitted).

## III.  ANALYSIS

### A.  Title IX Claim

Plaintiffs allege that GCC is liable under Title IX for Oliva's sexual harassment

because it was so severe, pervasive, and offensive that it deprived plaintiffs of

educational opportunities and benefits.  Docket No. 1 at 19-20, ¶¶ 154-164.  Defendants

move to dismiss plaintiffs' Title IX claims on several grounds.  Docket No. 22 at 3-6;

Docket No. 29 at 1-5.  First, defendants argue that "Plaintiffs' Title IX claim should be

dismissed because Plaintiffs failed to plead facts in the Complaint to show that 'Defendant GCC received federal financial assistance' and it is a conclusory allegation without support."  Docket No. 29 at 3.  Title IX applies to education programs and activities receiving federal assistance.  20 U.S.C. § 1681(a).  The complaint alleges that, "[a]t all relevant times, Defendant GCC received federal financial assistance."  Docket No. 1 at 19, ¶ 156.  The Court finds that this allegation is not conclusory and will not dismiss plaintiffs' Title IX claim on this basis.

Second, defendants argue that the Supreme Court has rejected respondeat superior and agency liability against a school district for a teacher's sexual harassment of a student absent actual notice to a school district official.  Docket No. 22 at 5 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998)).  Supervisory liability may be imposed on an educational institution under Title IX if (1) the defendant "remains deliberately indifferent to acts of harassment of which it has actual knowledge;" (2) "the harassment was reported to an appropriate person with the authority to take corrective action to end the discrimination;" and (3) "the harassment was so severe, pervasive and objectively offensive that it deprived the victim of access to the educational benefits or opportunities provided by the school."  *Escue v. Northern OK College,* 450 F.3d 1146, 1152 (10th Cir. 2006) (quoting *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir.1999); *Gebser*, 524 U.S. at 290) (quotation marks and alterations omitted).  Defendants do not dispute that plaintiffs plausibly alleged that the harassment was reported to an appropriate person with the

authority to take corrective action and that it was so severe, pervasive, and objectively offensive that it deprived plaintiffs of access to educational benefits or opportunities.[2]

Defendants also argue that "Plaintiffs have not alleged that Defendant GCC discriminated against them because of their sex."  Docket No. 22 at 6.  Plaintiffs respond that "Ms. Oliva's sexual assaults of Plaintiffs are plainly acts of sex discrimination under well-settled law."[3]  Docket No. 26 at 4.  When considering a plaintiff's allegation that her college professor made numerous sexual comments and touched her inappropriately without her consent, the Tenth Circuit held that "[s]exual harassment is a form of discrimination on the basis of sex and is actionable under Title IX."  *Escue*, 450 F.3d at 1152; *see also Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992) (holding that Title IX's prohibition on discrimination on the basis of sex is violated when a teacher sexually harasses and abuses a student); *Doe v. Sch. Dist. No.*

---

[2] Defendants argue for the first time in their reply that plaintiffs failed to allege sex-based discrimination because the "alleged actions of Ms. Oliva, who was not a school official, do not undermine the purposes of the educational system and Plaintiffs have not plead facts sufficient to show the alleged abuse is so severe, pervasive, and objectively offensive that it deprived them of equal access to any educational resources, opportunities, or benefits."  Docket No. 29 at 3 (quotation marks omitted).  The Court will not consider these arguments because defendants raised them for the first time in a reply.  *See Gutierrez v. Cobos*, 841 F.3d 895, 902 (10th Cir. 2016) ("a party waives issues and arguments raised for the first time in a reply brief." (quoting *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011)).

[3] Defendants argue that the cases plaintiffs cite as well-settled law are distinguishable because the "defendants and sexual harassers [in those cases] admitted to or were charged with sexually abusing or harassing the plaintiffs, but here, Plaintiffs have provided no facts to support that they were actually subjected to any discrimination on the basis of their sex."  Docket No. 29 at 3.  This argument fails because plaintiffs plausibly allege that Oliva sexually assaulted them and because Title IX does not require plaintiffs to allege that their abusers admitted to or were charged with abuse.

*1, Denver, Colo.*, 970 F.3d 1300, 1311 (10th Cir. 2020) (holding that sexual assault of plaintiff was an act of sex discrimination).  Plaintiffs allege that Oliva sexually harassed and assaulted them.  *See, e.g.,* Docket No. 1 at 8, 12, ¶¶ 47, 92.  Therefore, the complaint plausibly alleges that plaintiffs suffered acts of sex discrimination.

Defendants also appear to argue that "Plaintiffs have not alleged . . . that they were subjected to discrimination under any educational program" because "Ms. Oliva is not a teacher at the school and there are no allegations that the events occurred at the school or during school hours."  Docket No. 22 at 6.  Defendants claim that "there are no allegations of Ms. Oliva engaging in sexual harassment/act [sic] with Plaintiffs in the GCC School or in the role of a school staff member," and argue that "Plaintiffs fail to show how Ms. Oliva's actions fall under the GCC School's disciplinary authority."  Docket No. 29 at 4.  Plaintiffs respond that the "GCC residential facility and the school are not separate organizations but part of the same program, with the school operating under the umbrella of GCC."  Docket No. 26 at 5.  The complaint alleges that GCC is "responsible for providing Plaintiffs [with] full and equal access to a public education" and that residents who live on the GCC campus are required to attend the GCC school.  Docket No. 1 at 3, ¶¶ 9-10.  GCC staff are responsible for walking residents to school, staying in the classroom with the residents throughout the school day, walking the residents back to the residential lodges at the end of the school day, and ensuring that residents do their schoolwork.  *Id.* at 5-6, ¶¶ 28-31.  Moreover, the complaint alleges that D.B. met Oliva when she was a school staff member and she "frequently [sought] out D.B. at the school and flirt[ed] with him during their encounters."  *Id.* at 6, ¶ 33.

Thus, the complaint alleges that the discrimination occurred under an educational program.

Defendants argue that "Plaintiffs have failed to show that Defendant GCC had actual knowledge of Ms. Oliva's alleged sexual harassment of Plaintiffs or . . . that Defendant GCC was 'deliberately indifferent.'"  Docket No. 22 at 6.  The Tenth Circuit has held that, although the Supreme Court's holding in *Gebser* "makes clear that 'actual notice requires more than a simple report of inappropriate conduct by a teacher[,] . . . the actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student.'"  *Escue*, 450 F.3d at 1154 (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D. Me. 1999)).  In *J.M. ex rel. Morris v. Hilldale Indep. Sch. Dist. No. 1-29*, 397 F. App'x 445, 451-53 (10th Cir. 2010) (unpublished), the Tenth Circuit considered a jury's finding that a school district was liable for a teacher's inappropriate sexual conduct under Title IX.  The court found that the jury could reasonably have concluded that the principal, and therefore the district, had actual knowledge of the teacher's misconduct because the principal had been informed that (1) a teacher had been in a motel room behind a closed door with a student and (2) another student accused the teacher of being a pedophile.  *Id.* at 453.

Plaintiffs allege that, in December 2019, Ms. Cantwell informed Ms. Lockett that Oliva had a sexual relationship with F.B.[4] and Ms. Lockett shared the information with Ms. Sossi.  Docket No. 1 at 15, ¶¶ 118, 121-22.  Plaintiffs also allege that Ms. Cantwell

---

[4] The Tenth Circuit has held that "reported incidents of harassments against students other than the plaintiff may establish actual notice of Title IX discrimination." *Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1056 (10th Cir. 2023).

conducted her own investigation by speaking with other residents about Oliva's
misconduct and reported the results to Ms. Lockett on a weekly basis.  *Id.* at 16, ¶¶ 125,
129.  These allegations plausibly allege actual knowledge by GCC.

Finally, defendants argue that plaintiffs have not pled "any facts to show that
Defendant GCC was 'deliberately indifferent.'"  Docket No. 22 at 6.  Plaintiffs respond
that the allegations in the complaint clearly show that, despite actual knowledge of
Oliva's sexual abuse, Ms. Sossi "continuously refused to take any meaningful corrective
action despite mounting reports, and eventually terminated the whistleblower employee
instead of the harasser."  Docket No. 26 at 7.  The complaint alleges that Ms. Sossi told
Ms. Lockett to "ignore Ms. Cantwell's complaints and took no meaningful investigatory
action," and that, after Ms. Cantwell began to report her concerns to Ms. Lockett on a
weekly basis, Ms. Sossi told Ms. Lockett to "order Ms. Cantwell to stop speaking to
residents about these issues," rather than to investigate Oliva.  *Id.*  In addition, the
complaint alleges that, in response to Ms. Cantwell's reports, Ms. Lockett told Ms.
Cantwell that "the residents at GCC were not to be trusted and without additional
evidence there was nothing that could be done," but that Ms. Sossi "took no action to
meaningfully investigate the allegations against Oliva."  Docket No. 1 at 16-17, ¶¶ 123-
24, 137.  The Tenth Circuit has held that a defendant may be deliberately indifferent,
and thus liable under Title IX, if it fails to conduct an investigation in the face of actual
knowledge that a school employee is harassing a student.  *See Hilldale*, 397 F. App'x at
454 (holding that a reasonable jury could find deliberate indifference where no school
official investigated a teacher accused of sexual harassment or questioned the alleged

victim).  Therefore, plaintiffs have plausibly alleged deliberate indifference on the basis of GCC's failure to investigate Oliva.[5]

For the foregoing reasons, the Court will not dismiss plaintiffs' Title IX claim.

**B.  Fourteenth Amendment Claim**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'  Thus, under the state action doctrine, a proper defendant in a § 1983 action is one who represents the state in some capacity."  *Schwab v. Kansas Dep't of Child. & Fams.*, 851 F. App'x 110, 117 (10th Cir. 2021) (unpublished) (citations omitted).  Defendants argue that plaintiffs' § 1983 claim should be dismissed because plaintiffs fail to allege state action.  Docket No. 22 at 7-9.

### *1. GCC*

The complaint appears to allege that GCC is a state actor under § 1983 because (1) the "claims against Defendant GCC directly relate to the core of the service for which GCC was contracted by the State of Colorado" and (2) "Plaintiffs' involuntary placement at GCC is indicative of GCC's State actor status."  Docket No. 1 at 21, ¶¶ 170-71.

---

[5] Defendants also argue that allegations in the complaint show that Oliva "was appropriately disciplined and supervised," Docket No. 29 at 5, because Oliva was placed on administrative leave for several weeks following the lap-sitting incident and she told G.H. that they needed to be more careful.  *Id.* at 5 n.3.  However, these allegations do not render plaintiffs' allegations that Ms. Sossi failed to investigate Oliva following Ms. Cantwell's reports insufficient to allege deliberate indifference.  To the contrary, the allegation that Oliva was placed on administrative leave for the lap-sitting incident supports an argument in favor of deliberate indifference based on the failure to investigate since it predates at least some of Ms. Cantwell's reports.  *See* Docket No. 1 at 8, ¶ 45 (alleging that Oliva was transferred to the Avalanche Building after returning from administrative leave); *id.* at 11, ¶ 69 (alleging that Oliva was working at the Avalanche Building in January 2020; *id.* at 15-16, 18, ¶¶ 119, 121, 129, 144 (alleging that Ms. Cantwell first contacted Ms. Lockett in December 2019, reported her concerns to Ms. Lockett on a nearly weekly basis, and was not terminated until February 25, 2020).

The Tenth Circuit has applied four tests for whether a defendant's conduct constitutes state action for a § 1983 claim. These tests are the "nexus test," the "symbiotic relationship test," the "joint action test," and the "public function test." *See Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1448 (10th Cir. 1995); *Wittner v. Banner Health*, 720 F.3d 770, 775 (10th Cir. 2013). Plaintiffs appear to argue that GCC is a state actor based on either the nexus test or the public function test. Docket No. 26 at 9-10.

"Under the nexus test, a plaintiff must demonstrate that 'there is a sufficiently close nexus' between the government and the challenged conduct such that the conduct 'may be fairly treated as that of the State itself.'" *Gallagher*, 49 F.3d at 1448 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)). Plaintiffs point to *Milonas v. Williams*, 691 F.2d 931, 934-36 (10th Cir. 1982), in which the Tenth Circuit considered a § 1983 claim brought against a privately owned and operated school that contracted with the state to educate minors with behavioral problems. Docket No. 26 at 9-10. The court found that "there was a sufficiently close nexus between the states sending boys to the school and the conduct of school authorities so as to support a claim under Section 1983" because:

> Many of the members of the class were placed at the school involuntarily by juvenile courts and other state agencies acting alone or with the consent of the parents. Detailed contracts were drawn up by the school administrators and agreed to by the many local school districts that placed boys at the school. There was significant state funding of tuition and, in fact, the school itself promoted the availability of public school funding in its promotional pamphlet. There was extensive state regulation of the educational program at the school.

*Milonas v. Williams*, 691 F.2d at 940. Here, the complaint alleges that plaintiffs were placed at GCC involuntarily, Docket No. 1 at 5, 10, ¶¶ 24, 67, but it does not allege that

16

GCC received state funding, that there were detailed contracts between GCC and local school districts, or that there was extensive state regulation of GCC's program. Therefore, *Milonas* is distinguishable.

Moreover, under the nexus approach, "a state normally can be held responsible for a private decision 'only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'"  *Gallagher*, 49 F.3d at 1448 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).  "[T]he fact that a private entity contracts with the government . . . does not automatically transform the conduct of that entity into state action."  *Id.*  (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 840-42 (1982)).  Plaintiffs do not allege that any decisions by GCC were the result of government coercion or encouragement or that GCC's relationship with the government extended beyond providing contracted-for services.  Therefore, the Court finds that the complaint does not plausibly allege state action under the nexus test.

Under the public function test, a private party is a state actor if the state delegates to it a function "traditionally exclusively reserved to the State."  *Id.* at 1456 (quoting *Jackson*, 419 U.S. at 352).  In *Rendell-Baker*, the Supreme Court found that a private school serving students who experienced difficulty completing public high school and who had been referred to the private school by government bodies was not a state actor.  *Rendell-Baker*, 457 U.S. 831-32.  It held that, although "[t]here can be no doubt that the education of maladjusted high school students is a public function," the fact that the state legislature chose to provide those services at public expense "in no way makes these services the exclusive province of the State."  *Id.* at 842.  Plaintiffs allege

that GCC "was contracted by the State of Colorado . . . to provide a variety of services related to supervising, caring for, treating, and rehabilitating children in the custody of the State."  Docket No. 1 at 21, ¶ 170.  They argue that the complaint alleges that plaintiffs were involuntarily placed "in GCC, which performed traditional functions of the state."  Docket No. 26 at 10.  However, under *Rendell-Baker*, a defendant is a state actor if it provides services that are the "exclusive province of the State." *Rendell-Baker*, 457 U.S. at 842.  Because plaintiffs have failed to allege that the "traditional functions of the state" that GCC performs are the *exclusive* province of the state, plaintiffs have failed to allege that GCC is a state actor based on the public function test.

### 2.  Ms. Sossi

The complaint alleges that "Defendant Sossi was acting under the color of state law in her capacity as CEO of GCC."  Docket No. 1 at 21, ¶ 172.  Because the complaint fails to allege that GCC is a state actor, it also fails to allege that Ms. Sossi was acting under color of state law as its CEO.

For the reasons stated above, the Court finds that the complaint does not plausibly allege state action by defendants.  Accordingly, the Court will dismiss plaintiffs' second cause of action.

### C.  CSAAA Claim

Defendants urge the Court to dismiss plaintiffs' third cause of action on the basis that the Colorado Supreme Court held that the CSAAA is unconstitutional.  Docket No. 22 at 12 (citing *Aurora Pub. Schs. v. A.S.*, 531 P.3d 1036, 1049 (Colo. 2023)).  The CSAAA, enacted on January 1, 2022, allows a victim of sexual misconduct that occurred while the victim was a minor participating in a youth-related activity or program

to bring a civil cause of action against the organization that managed the activity or program. Colo. Rev. Stat. § 13-20-1202(1). Section 13-20-1203(2) of the CSAAA permits the victim of misconduct that occurred between January 1, 1960 and December 31, 2021 to bring an action before January 1, 2025. Colo. Rev. Stat. § 13-20-1203(2). In *Aurora Pub. Schs.*, the Colorado Supreme Court held that § 13-20-1203(2) violated the Colorado Constitution because it is "unconstitutionally retrospective to the extent that it permits a victim to bring a claim for sexual misconduct based on conduct that predates the [CSAAA] and for which previously available causes of action were time-barred." *Aurora Pub. Schs.*, 531 P.3d at 1050. However, this holding "does not affect claims brought under the CSAAA for which the previously applicable statute of limitations had not run as of January 1, 2022." *Id.*

Defendants argue that, since the alleged misconduct predates the CSAAA, plaintiffs' third claim for relief "must be dismissed as a matter of law because it violates . . . Colorado's constitution." Docket No. 22 at 13. Plaintiffs respond that "*Aurora Public Schools'* retrospectivity holding is inapplicable" because "Plaintiffs' claims tolled until they attained the age of majority . . . [and] [t]hereafter, Plaintiffs entered into a series of agreements up to and including the date on which they filed suit." Docket No. 26 at 15. The tolling agreements are not referenced in the complaint.

The Tenth Circuit has held that "the contention that [a] state statute is unconstitutional is an affirmative defense." *Kewanee Oil & Gas Co. v. Mosshamer*, 58 F.2d 711, 712 (10th Cir. 1932); *see also Pliska v. City of Stevens Point, Wis.*, 823 F.2d 1168, 1173 (7th Cir. 1987) ("The unconstitutionality of an ordinance is an affirmative defense."). In fact, defendants' answer lists its argument that the CSAAA is

unconstitutional among its affirmative defenses.  Docket No. 21 at 23, ¶ 8.  An affirmative defense may be considered on a motion to dismiss under Rule 12(b)(6) only when a plaintiff admits every element of the affirmative defense in the complaint. *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018) (citing *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004)).  In *Aurora Pub. Schs.*, the court held that its holding finding the CSAAA's retroactive provision unconstitutional "does not affect claims brought under the CSAAA for which the previously applicable statute of limitations had not run as of January 1, 2022."  *Id. Aurora Pub. Schs.*, 531 P.3d at 1050.  Plaintiffs do not admit in their complaint that the statute of limitations has run on their CSAAA claim.  Therefore, plaintiffs have not admitted every element of defendants' affirmative defense of unconstitutionality and the Court may not consider it.  The Court will not dismiss plaintiffs' third cause of action.

### D.  Negligence and Negligent Infliction of Emotional Distress Claims

Defendants argue that the Court should dismiss plaintiffs' fifth and sixth causes of action because "claims for negligence and negligent infliction of emotional distress . . . are subsumed by the Colorado premises liability statute and must be dismissed as a matter of law."  Docket No. 22 at 13.  The Colorado Premises Liability Act ("PLA") is the "'exclusive remedy' available for parties injured on the property of another."  *Cereceres v. Walgreens Co*, No. 20-cv-03406-PAB-KMT, 2021 WL 4170457, at *2 (D. Colo. Sep. 14, 2021) (citing *Vigil v. Franklin*, 103 P.3d 322, 329 (Colo. 2004)); Colo. Rev. Stat. § 13-21-115(3) ("In any civil action brought against a landowner[,] . . . the landowner is liable only as provided [by the PLA].").  However, the PLA "only applies if the party sought to be held liable is a 'landowner' under the statute."  *Cereceres*, 2021 WL

4170457 at *2 (citing Colo. Rev. Stat. § 13-21-115(1); *Pierson v. Black Canyon Aggregates, Inc.,* 48 P.3d 1215, 1219 (Colo. 2002)).  Here, defendants deny being a "landowner" in their answer to plaintiffs' complaint.  Docket No. 21 at 20, ¶ 197; *see* Docket No. 1 at 24, ¶ 197.

In *Cereceres*, the plaintiff asserted one claim under the PLA and, in the alternative, one claim for negligence.  *Cereceres,* 2021 WL 4170457, at *1.  The defendant denied being a landowner in its answer, but filed a partial motion to dismiss in which it argued that plaintiff's negligence claim must be dismissed because the PLA is the exclusive remedy against a landowner.  *Id.*  The Court observed that defendant did not avail itself of the "opportunity to admit landowner status and, as a result, dismiss plaintiff's negligence claim" and held that plaintiff was permitted to maintain alternative claims since defendant denied being a landowner and the pleadings did not "definitively establish defendant's landowner status."  *Id.* at *3.  Here, defendants do not argue that the complaint definitively establishes GCC's landowner status and their answer denies that GCC is a landowner.  Therefore, the Court will permit plaintiffs to maintain their alternative claims to their PLA claim and will not dismiss their fifth and sixth causes of action*.*

**IV. CONCLUSION**

Therefore, it is

**ORDERED** that Defendants' Motion to Dismiss Plaintiffs' Complaint and Jury Demand Pursuant to F.R.C.P. 12(b)(6) [Docket No. 22] is **GRANTED in part and DENIED in part**.  It is further

**ORDERED** that plaintiffs' second cause of action is **DISMISSED without prejudice**.[6]

DATED March 4, 2024.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

---

[6] Dismissal with prejudice is proper only "where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend." *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001) (quoting *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 806 (10th Cir. 1999)).  It is not obvious that plaintiffs could not prevail on their § 1983 claim if given an opportunity to amend, particularly because they have not previously amended their complaint.