**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-1071

D.B, and
G.H.;

       Plaintiffs,

v.

GRIFFITH CENTERS FOR CHILDREN INC., a Colorado Corporation;
TANIA SOSSI, an Individual;

       Defendants.

---

## COMPLAINT AND JURY DEMAND

---

### I.      INTRODUCTION

From early-2019 to mid-2020, Viridiana Oliva, a residential staff member employed by Griffith Centers for Children ("GCC"), sexually assaulted multiple minor boys housed at GCC. Oliva also sent self-pornographic materials to such boys, including pictures and videos of herself in underwear, touching herself, and she requested explicit photos from the boys in return. Oliva could not have carried out this brazen sexual abuse without the complicity of GCC, a non-profit organization whose mission is "to create a structured and therapeutic environment that empowers youth to build healthy relationships, succeed in education, and be productive members of society."

Over the course of Oliva's employment, Griffith Center enabled her sexual abuse by dismissing multiple complaints against Oliva, ranging from her providing contraband to minors to outright sexual assault. Instead of implementing additional oversight over Oliva or taking

meaningful disciplinary action against her, Griffith Center took the extraordinary step of terminating the employee who persistently attempted to alert management to the danger Oliva posed.

As a result, Oliva was permitted to be alone with minor boys even after GCC had received multiple allegations of her inappropriate conduct. GCC also failed to timely report the allegations to law enforcement or to social services in direct contravention of Colorado's mandatory child abuse reporting scheme. Instead, GCC placed young, vulnerable, at-risk minors – many of whom had troubled pasts – at Oliva's mercy, providing her a safe harbor to carry out her sexual abuse and molestation.

GCC's failure to investigate, supervise and/or discipline Oliva was malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm she inflicted upon Plaintiffs. As a result, D.B. and G.H. have suffered immeasurably from Oliva's perverse and violative conduct. The sexual assault and abuse they have suffered will undoubtedly continue to adversely impact their lives. Plaintiffs bring this action to hold Defendants accountable.

## II.     JURISDICTION, VENUE, AND PARTIES

1.     This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983 and Title IX, 20 U.S.C. § 1681 *et seq*. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1367.  Jurisdiction supporting Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

2.      Venue is proper in the United States District Court for the District of

Colorado pursuant to 28 U.S.C. § 1391(b).  All of the events and omissions alleged herein

occurred within the State of Colorado.  At the time of the events and omissions giving rise

to this litigation, all of the Defendants resided in Colorado.

3.      Plaintiff D.B. is a resident of and domiciled in the State of Colorado.

4.      Plaintiff G.H. is a resident of and domiciled in the State of Colorado.

5.      Defendant Griffith Centers for Children ("GCC") is a residential housing facility

located at 17 Farragut Avenue, Colorado Springs, CO 80909.

### III.     Defendant GCC is a Juvenile Detention Facility that Contracts with the State of Colorado to House Children

5.

6.      Defendant GCC is licensed and monitored by the Colorado Department of Human

Services (DHS), Division of Child Care pursuant to Colo. Rev. Stat. § 26-6-102(8), *et seq.*

7.      Defendant GCC operates as a Residential Child Care Facility (RCCF) and

contracts with the Colorado Division of Youth Services (CDYS) to provide a variety of services

related to supervising, caring for, treating, and rehabilitating children in the custody of the State.

8.      Defendant GCC also contracts to offer detention services for the State.

9.      Defendant GCC carries out the public function of detaining youth at the direction

of the State for the purposes of punishment.

10.      Pursuant to their contract with the state, Defendant GCC is endowed with legal

authority to exercise control over the children placed at its facility under court-ordered

confinement.

11.      -The contract mandates almost every aspect of how such services are to be

provided, including but not limited to:

a.   GCC's programming under the Contract shall be in "operation twenty-four (24) hours a day, seven (7) days per week" and offer "adequate levels of supervision to ensure the safety of both youth and staff."

b.   GCC must "enhance or improve communication between programs to help reduce the anxiety often experienced by youth and their families, to improve treatment service transition and effectively engage DYC youth and their families in order to maximize successful outcomes."

c.   GCC must "allow the State to inspect the facility to determine the conditions under which the clients are housed and to audit and monitor the [] operations and services."

d.   GCC must comply with state mandates regarding staffing educational and licensing requirements, legal status, criminal background checks, and training.

e.   GCC must comply with all CDHS licensing rules, regulations, certification requirements, policies and standards.

f.   GCC is obligated to obtain additional certification and licensing by the Office of Behavioral Health Adolescent Substance Use Disorder Program.

g.   GCC cannot "enter into any subcontract in connection with its obligations under [the] Contract without providing notice to the State."

h.   GCC is required to provide security measures, including "physical plant security systems such as alarms, time lock doors, perimeter fencing, and etc."

i.   GCC must comply with "Prison Rape Elimination Act Standards (PREA) for Juvenile Facilities to the extent required by the PREA compliance level established by the Colorado Department of Human Services, Division of Youth Corrections."

j.   GCC "agrees to provide all client information and reports requested by the State and shall submit to the State adjustment and progress reports, as requested by DYC Client Managers, for all clients served by the program."

k.   GCC must "establish clearly defined policies, standards, and procedures similar to DYC Policy 9.4, for the short-term restraint and control of the adjudicated clients housed within its program facility."

l.   GCC is responsible for "supervised and safe transportation of DYC youth [] to parole hearings, court hearings, medical appointments, administrative review hearings, permanency hearings and to any locale necessary." GCC must "utilize measures and practices" to "reduce the risk of absconding during transport of youth."

m.   GCC must "maintain an individual file for each client [] and allow the State to review all information, data, and reports relating to any client upon request."

n.   The State controls the education curriculum at GCC facilities.

o.   GCC must conduct an annual audit and provide a copy to the state. The State also have unfettered access to GCC's financial records at any time.

p.   The State dictates the credentials and requirements of substance abuse treatments provided by GCC.

q.   The State establishes the staff to youth ratio that must be maintained by GCC, even at night when youth are asleep.

8. r.

12.    Pursuant to their contract, Defendant GCC is required to comply with strict requirements to ensure the care and protection of the children housed at its facilities and is accordingly subject to extensive state regulation of the educational program at the school.

13.    Defendant GCC does not have the authority to remove or expel residents from its program/ facility without a court order.

14.    Residents at GCC are under 24 hours/ 7 days supervision and their movements are restricted.

15.    Residents at GCC are not free to leave the facilities on their own volition and their liberties are entirely restricted.

16.    Defendant GCC receives payment from the State to house youth who are ordered by the court to be removed from their families and placed at GCC facilities.

9.17.   According to GCC tax filings, Defendant GCC received approximately $5,000,000 in program revenue from Colorado state agencies in 2018.

10.18.  Defendant GCC is responsible for providing Plaintiffs will full and equal access to a public education in compliance with state and federal law.

11.19.  Residents who live on the GCC campus must attend Griffith Centers J. Wilkens Opportunity School ("GCC School").

12.20.  GCC school's educational program is accredited by the Colorado Department of Education, and the credits earned by residents are transferable to other schools.

13.21.  Graduating from the program requires both academic and behavioral success.

14.22.  GCC School has a Title IX Coordinator named Susan Osburn to make sure that the school complies with its Title IX requirements.

15.23.  Defendant GCC is responsible for the oversight, supervision, and training of GCC employees.

16.24.  Defendant GCC's agents and employees are subject to provisions of Mandatory Child Abuse Reporting, as set forth in C.R.S. § 19-3-304, requiring mandatory reporting of sexual and/or inappropriate contact between staff and a resident at the facility.

17.25.  At all relevant times, Defendant GCC was the employer of Viridiana Oliva. Defendant GCC is a proper entity to be sued under 42 U.S.C. § 1983 and Title IX.

18.26.  Defendant GCC's official customs, policies, and/or practices caused the deprivation of Plaintiffs' constitutional and statutory rights.

### III.IV. FACTUAL ALLEGATIONS

19.27.  Viridiana Oliva ("Oliva") was hired by GCC in the Fall of 2019.

~~20.~~28.  Oliva's job entailed monitoring and caring for at-risk boys placed at GCC. Essentially, Oliva was tasked with the responsibility of watching the boys over the course of her eight-hour shift.

~~21.~~29.  Oliva carefully laid the groundwork for sexual abuse by positioning herself as a trusted figure to emotionally vulnerable children who lacked strong support networks.

~~22.~~30.  Oliva first gained the trust of her victims by purchasing cigarettes, alcohol, marijuana, cocaine, vapers, and phones for them, even though these substances and objects were prohibited at GCC.

~~23.~~31.  To the impressionable minors under her watch, the fact that Oliva was willing to violate the law and GCC rules to secure them contraband demonstrated that she was "cool" and could be trusted.

~~24.~~32.  Oliva used this trust to lure the victims into sexual relationships, imposing herself onto them and seeking sexual favors. Oliva's grooming was wildly successful: each of her victims trusted her and did whatever she wanted.

### ~~IV.~~V.   OLIVA BEGAN SEDUCING D.B. AFTER SHE BEGAN WORKING AT GCC

33.      In January of 2019, sixteen-year-old D.B. was removed from his family and involuntarily placed at GCC.

~~25.~~34.  In the course of his court-ordered placement at GCC, D.B. was not allowed to voluntarily leave the facility.

~~26.~~35.  At all times relevant to this Complaint, he was housed in the Avalanche Building.[1]

---

[1] GCC has several lodges that accommodate residents. Among these lodges are Rockies and Avalanche, which are designed to provide more structure and supervision to the residents.

27.36.  For the first couple of months at GCC, D.B. was successful. He did well in school and abided by the rules as he was motivated to complete the program and reunite with his family.

28.37.  Residents housed at GCC were expected to attend the school on campus.

29.38.  The morning staff at GCC would wake residents up, monitor them at breakfast and then walk them to the school for the day.

30.39.  The staff would then stay in the classroom with the residents throughout the school day. Staff's duties included making sure residents did not engage in fighting, to walk them to and from the bathroom, and to ensure no one left campus.

31.40.  School hours were from 9 a.m. to approximately 3:00 p.m. and the staff would walk the residents back to the residential lodge at the end of the school day, at which time there would be a staff shift change.

32.41.  The responsibilities of evening staff included making sure that residents did their schoolwork.

33.42.  GCC Staff had a point system they would use to punish or reward residents at the lodge based on their behavior at the school.

34.43.  D.B. first met Oliva when she started as a school staff member. Within hours of being introduced to her, Oliva approached D.B. and struck up a conversation. Oliva began frequently seeking out D.B. at the school and flirting with him during their encounters.

---

Rockies is for residents aged 12-14, while Avalanche caters to students aged 15-20. As students progress through their programs, they may move towards home-like lodging at Prospect, Transitional Skills Program (TSP), or Independent Living.

35.44.  Within days of meeting, Oliva furtively began supplying D.B. with cigarettes, alcohol, and marijuana which they would sometimes consume together in the TSP lounge. D.B. was aware that while Oliva provided him with contraband for free, she was selling it to everyone else, which made him feel special.[2]

36.45.  Oliva was eventually moved from the school and assigned as residential staff at the TSP Building. Relishing the special attention Oliva gave him, D.B., although housed at the Avalanche residential building, would sneak into the TSP building where Oliva worked so he could spend time with her.

37.46.  While sneaking over to TSP one night, D.B. walked into the lounge and saw Oliva and two other residents whispering to each other. The residents, friends of D.B., beckoned him over and told him they had just bought cocaine from Oliva and asked if he wanted to have some. D.B. declined.

38.47.  Within a short period of time after her move to TSP, Oliva escalated the sexual nature of her encounters with D.B..

39.48.  One day, while Oliva was standing in the doorway of one of the residents' room, D.B. stood in the hallway behind her joking with the resident in the room. Oliva slammed the door of the room shut and backed up into D.B., pushing her butt into his crotch. She backed him in the wall of the hallway, gyrating her hips into him until he was erect. She then turned around and started kissing him.

---

[2] Staff providing drugs to minor residents was a widespread problem at GCC. For example, Tommy Bryant, a charge at GCC, had also sold vape pens and cigarettes to D.B.. Eugene Cherry, another staff at GCC had sold D.B. marijuana.

40.49.  Afterwards Oliva and D.B. would often engage physically with each other with Oliva touching his penis through his clothes and guiding his hand into her vaginal area.

41.50.  Oliva publicly flouted her relationship with D.B..

42.51.  On one occasion, while a movie played in the TSP lounge, Oliva sat on D.B.'s lap with other residents in the vicinity. At some point, Noah LNU, a GCC staff member, stuck his head through the TSP lounge window and observed Oliva sitting on D.B.'s lap. A few minutes later a nighttime charge named Pam LNU came into the lounge, saw Oliva sitting on D.B.'s lap and immediately turned off the movie. She reprimanded D.B. by sending him back to his residential building (Avalanche) and ordered all the other boys to go to their rooms.

43.52.  Employees assigned as charges at GCC oversaw the entire campus and were responsible for complying with Colorado's mandatory child reporting laws.

44.53.  No one from GCC ever questioned D.B. about the lap-sitting incident.

45.54.  Oliva did not return to GCC for two weeks after the incident. Upon her return, D.B. asked her why she hadn't been to work. Oliva told him, "Because Noah is a bitch-ass snitch."

46.55.  Despite the incident with D.B., within a week of her return, Oliva was transferred out of TSP and to the Avalanche Building, where D.B. was housed.

47.56.  Oliva's move from TSP to Avalanche meant she could now spend more time with D.B.. She would often take D.B. on walks alone where they would engage in sexual contact. These walks would happen late in the evening and occurred for months with the intensity of the sexual contact increasing as they spent more and more time together.

48.57.  During a night shift, Oliva came into D.B.'s room, pushed him onto his bed and began performing oral sex on him. After that, D.B. and Oliva routinely spent large portions of her shift together, engaging in kissing, sexual stimulation, and intercourse.

49.58.  One night, boys on the same floor as D.B. heard a commotion in his room. They gathered at the door and saw Oliva engaged in sexual intercourse with D.B..

50.59.  Ashley LNU, a charge at GCC, later saw Oliva walking out of D.B.'s room. D.B. heard Ashley order Oliva to complete the remainder of her shift at TSP.

51.60.  No one from GCC ever questioned D.B. about Oliva's presence in his room that night.

52.61.  After some time, Oliva told D.B. that she was no longer allowed to take kids out for walks alone.

53.62.  However, D.B. and Oliva continued to engage sexually in his room and within the Avalanche building.

54.63.  In addition to the sexual encounters happening at GCC during Oliva's shift, she pressured D.B. to leave GCC at night so that they could spend more time together.

55.64.  At her request, D.B. was leaving GCC as often as twice a week, despite it being against GCC rules, jeopardizing his ability to succeed in the program.

56.65.  Oliva would pick up D.B. at Memorial Park and they would engage in sexual intercourse either in the car or at a nearby park.

57.66.  One night, while walking to meet Oliva, D.B. was assaulted by an unknown person and sustained serious injuries to his face and hand. He walked back to GCC, and a staff member did a write-up of his injuries. D.B. cleaned up and left GCC again.

58.67.  Despite being hurt and the danger of going out alone again, D.B. felt that if he did not meet Oliva, she would stop supplying him with contraband or get him in trouble at the school.

59.68.  D.B. and Oliva made little effort to hide their relationship and multiple GCC employees and administrators knew of Oliva's predilection to supply GCC residents with contraband and engage with them sexually.

60.69.  In a therapy session, D.B.'s therapist, Teresa Meza, asked D.B. "how is the head" in reference to the oral sex he was receiving from Oliva.

61.70.  Ms. Meza also asked D.B. how he felt about girls sitting on his lap in reference to the incident in which Oliva was caught sitting on D.B.'s lap.

62.71.  D.B. secretly recorded this session with Ms. Meza on a phone and later played it to his friend, Benjamin Moore.

63.72.  Nikki Swanhart was a Residential Mental Health Technician at GCC during the time that D.B. was there. Ms. Swanhart also indicated knowledge of the relationship between D.B. and Oliva. She often nodded her head disapprovingly whenever she saw him with Oliva.

64.73.  Danielle Stuut is the High School Social Studies teacher at the GCC. Although Ms. Stuut did not work in the residential houses, she also expressed suspicion about Oliva, frequently questioning D.B. about the amount of time he spent with Oliva. She asked the questions in such a way that D.B. felt she already knew the answer but simply wanted to let him know that she knew. The questions would be followed by statements of guidance – advising him not to do "stuff he wasn't supposed to do," not to "ruin his future over a girl" and to "straighten up."

65.74.  Deanna Cantwell, a behavioral therapist at GCC, would often question D.B. about his relationship with Oliva and would advise him to stay away from her.

66.75.  Before his engagement with Oliva, D.B. was highly motivated to do well at GCC. He was determined to complete the program and reunite with his family.

67.76.  However, as a result of Oliva's abuse, D.B. experienced a significant decline in his academic and behavioral performance. Specifically, he was repeatedly written up for leaving campus without permission, his grades suffered, and he lost interest in school altogether.

## V.VI.   OLIVA SEDUCED G.H.

77.     G.H. was ordered by a court to be placed at GCC and moved onto the campus in November of 2019.

68.78.  In the course of his court-ordered stay at GCC, G.H. was not allowed to voluntarily leave the facility.

69.79.  G.H.'s room was right next to D.B.'s at the Avalanche Building and the boys became friends.

70.80.  G.H. met Oliva in January of 2020 after she started working at the Avalanche Building.

71.81.  D.B. told G.H. that Oliva allowed boys to break the rules and could do favors for them such as buying them contraband.

72.82.  G.H.'s interactions with Oliva started off flirtatiously.

73.83.  For example, Oliva would pretend to bump into him, drop something on the floor and bend down suggestively to pick it up, or graze him with her body.

74.84.  As time went on, Oliva's flirting became more pronounced.

75.85.  Oliva often took the Avalanche boys for walks to the park.

76.86.  On his first walk to the park with Oliva, G.H., seeing a dab pen in her pocket, asked if he could "hit that shit." Oliva turned the comment into a sexual one, responding by asking him if he could handle "all this" while running her hand over her body.

77.87.  A few days later, while at the park with Oliva, G.H. hung back while the other boys ran around. Oliva jokingly tackled G.H. over a comment and they started to wrestle on the ground. The wrestling turned into touching, as Oliva ran her hand over G.H.'s crotch and pressed down, giving him an erection. She then moved G.H.'s hands over her body, pressing his face into her breasts.

78.88.  Oliva began buying G.H. cigarettes, marijuana, dab pens, and vapors. She would bring fireball shooters (alcohol) for them to consume during their walks to and from the park.

79.89.  While some walks included other boys from the house, other times they would go alone.

80.90.  The more walks they went on, the more their physical contact increased, eventually leading to kissing and sexual touching.

81.91.  Often, after returning from walks with Oliva, staff would notice the smell of marijuana and alcohol on G.H., prompting them to administer a urinalysis (UA).

82.92.  However, GCC continued to permit G.H. to take unsupervised walks with Oliva.

83.93.  Oliva pressured G.H. to sneak out of GCC and come see her after her shift ended.

84.94.  As a result, G.H. was written up on numerous occasions for leaving the GCC after hours.

85.95.  However, no one ever questioned G.H. about where he went and who he was seeing.

86.96.  Oliva bought G.H. a phone so they could text each other.

87.97.  Oliva would routinely use snapchat to send pictures of herself in underwear to G.H..

88.98.  D.B. would also use G.H.'s phone to send and receive sexually explicit messages with Oliva.

89.99.  G.H. was caught with the phone on multiple occasions.

90.100.       GCC blamed his mom for providing the phone, but G.H.'s mom was adamant that she had not done so, and she asked GCC to investigate how G.H. came to possess a phone.

91.101.       Upon information and belief, no investigation was ever conducted.

92.102.       In the meantime, Oliva continued to escalate her sexual encounters with G.H.. She would come into G.H.'s room and engage in kissing and touching.

93.103.       One night, while working the night shift, Oliva walked into G.H.'s room, pushed him on the bed, pulled down his pants and performed oral sex on him.

94.104.       G.H. knew that Oliva engaged in similar behavior with D.B. and it became apparent that she enjoyed both of them knowing about her engagements with the other.

95.105.       While riding to a bowling event, Oliva chose to sit in the back of the bus with G.H. and D.B. on both sides of her. She slid her hands inside their pants attempting to give them simultaneous hand jobs.

96.106.       Noah LNU was driving the bus and G.H. noticed him staring at them from their rear-view mirror.

97.107.         G.H. had also seen another boy at the GCC pinch and smack Oliva's butt while Oliva just smiled at him, leading G.H. to think that she was likely in sexual relationships with other boys.

98.108.         In the spring of 2020, Oliva told G.H. that they needed to be more careful. She informed him that she was no longer allowed to take boys to the park by herself.

99.109.         GCC employees Noah LNU and Casey LNU began to accompany Oliva to the park with the boys.

100.110.         On another occasion, Pierre LNU, a charge at GCC, saw Oliva in G.H.'s room one night.

101.111.         Afterward, Oliva was never scheduled to work a night shift at the Avalanche Building.

### VI.VII.    OLIVA'S SEXUAL RELATIONSHIPS WITH RESIDENTS WAS COMMON KNOWLEDGE AT GRIFFITH CENTER

102.112.         Benjamin Moore was admitted to GCC in 2017 and housed at TSP.

103.113.         Mr. Moore became close friends with Oliva – and she often took Mr. Moore off-campus, drove him to her house and at one point even took him to her sister's volleyball game.

104.114.         Mr. Moore and Oliva would use marijuana together which she often provided.

105.115.         Although Mr. Moore did not have a sexual relationship with Oliva, he is aware of multiple residents at Griffith Center with whom Oliva engaged with sexually.

106.116.         Mr. Moore frequently heard another resident named F.B., brag about a sexual relationship with Oliva, and show residents pictures that Oliva sent to him in revealing clothing and of her masturbating.

107.117.      Mr. Moore also learned that D.B. and Oliva "were together" and it eventually became common knowledge at Griffith Center that the two were in a "sexual relationship."

108.118.      Mr. Moore saw Oliva and D.B. constantly hanging out together, going on walks alone, and disappearing for hours at a time.

109.119.      Mr. Moore was present and recalls the occasion on which Oliva was caught sitting on D.B.'s lap during a movie.

110.120.      Afterward, Oliva texted Mr. Moore to inform him that she was being placed on administrative leave for three weeks because of the incident.

111.121.      However, upon her return, Oliva and D.B.'s relationship only escalated.

112.122.      D.B. confided in Mr. Moore that he was sneaking off campus almost twice a week to have sex with Oliva.

113.123.      On one occasion, D.B. played a recording to Mr. Moore of a therapy session that D.B. had with Theresa Meza.

114.124.      In the recording, Ms. Meza could be heard questioning D.B. about his relationship with Oliva.

115.125.      A case manager at GCC, Eugene Cherry, who had a close relationship with both D.B. and Mr. Moore, also told Mr. Moore that D.B. had confided in him about his relationship with Oliva.

116.126.      Dalton Campbell, another individual housed at the Griffith Center in the Avalanche Building, also observed Oliva engaging in inappropriate behavior with a student during a field trip to a park.

117.127.      Such an incident did not surprise Mr. Campbell as he had previously seen Oliva and this student interacting inappropriately at GCC school.

### VII.VIII.   GCC FAILED TO APPROPRIATELY RESPOND TO REPORTS OF OLIVA'S ABUSIVE BEHAVIOR

118.128.      Deanna Cantwell worked at GCC from May 2019 to February 2020.

119.129.      In December of 2019, Ms. Cantwell was approached by F.B., who informed Ms. Cantwell that Oliva had been supplying him with cocaine, sexting him via Snapchat on a phone she gave him, and engaging with him sexually.

120.130.      Ms. Cantwell brought these allegations to the attention of Pierre LNU, a charge at GCC.

121.131.      Pierre dismissed Ms. Cantwell's report, telling her that the resident must be lying and that there was nothing to be done.

122.132.      Ms. Cantwell then went to the Human Resources Director, Erin Lockett and relayed the information she had received from F.B. regarding Oliva.

123.133.      Ms. Lockett communicated the information Ms. Cantwell presented to Tanya Sossi, President and Chief Executive Officer (CEO) of GCC.

124.134.      CEO Sossi directed Ms. Lockett to ignore Ms. Cantwell's complaints and took no action to meaningfully investigate the allegations against Oliva.

125.135.      Ms. Lockett then told Ms. Cantwell that the residents at GCC were not to be trusted and without additional evidence there was nothing that could be done.

126.136.      Undeterred by the GCC administration's lackluster response, Ms. Cantwell began to conduct her own investigation and started to speak to other residents at GCC.



127.137.     Based on her investigation, Ms. Cantwell learned that all the residents knew that Oliva was someone who could provide them with contraband.

128.138.     It also seemed that many residents knew of at least one resident who engaged with Oliva sexually.

129.139.     Ms. Cantwell realized that Oliva's illicit behaviors were common knowledge at the GCC campus.

130.140.     Ms. Cantwell began reporting what the GCC residents were telling her to Ms. Lockett on a near weekly basis.

131.141.     Ms. Lockett would then relay the information to CEO Sossi.

132.142.     CEO Sossi directed Ms. Lockett to stop Ms. Cantwell from speaking to the residents about these issues.

133.143.     Ms. Lockett scheduled a staff meeting.

134.144.     Ms. Cantwell assumed that the meeting would provide some training/guidance on the appropriateness of staff interaction with residents. Instead, the discussion focused on HIPAA requirements and how employees were prohibited from speaking to kids from different buildings and not to convey that information to others.

135.145.     Despite GCC's unmistakable message to Ms. Cantwell to cease communicating with residents about Oliva, Ms. Cantwell persisted.

136.146.     G.H. told Ms. Cantwell that Oliva was taking the boys on walks to the park, that he had smoked marijuana with her while at the park, and that he and Oliva had wrestled around.

137.147.    Ms. Cantwell again went to HR and reported to Ms. Lockett about what G.H. had told her.

138.148.    Ms. Lockett again told Ms. Cantwell that the students at GCC could not be trusted to tell the truth and there was nothing anyone could do without evidence.

139.149.    Frustrated by GCC's cavalier response, Ms. Cantwell questioned Ms. Lockett over why Oliva was allowed to take the kids on unsupervised walks – despite GCC being aware of the concerns she had raised in the past months about Oliva's behavior with the kids.

140.150.    At CEO Sossi's direction, Ms. Lockett told Ms. Cantwell that this was Avalanche business and she had no right to question why they were doing things a certain way.

141.151.    In an effort to convince Ms. Lockett to take the allegations against Oliva more seriously, Ms. Cantwell asked G.H. to accompany her to HR to directly report what had been happening between him and Oliva.

142.152.    Afraid of getting in trouble, G.H. initially refused.

143.153.    Ms. Cantwell explained to G.H. that none of the contraband that Oliva was providing him with, or the physical behavior was his fault and that he would not get in trouble for Oliva's behavior.

144.154.    G.H. eventually agreed to go to HR with Ms. Cantwell.

145.155.    On Tuesday, February 25, 2020, Ms. Cantwell advised Ms. Lockett that G.H. was willing to talk to her about Oliva and that Ms. Cantwell would bring him to the HR office on Thursday.

146.156.    Wednesday was Ms. Cantwell's day off.

147.157.      When Ms. Cantwell arrived at work on Thursday, she was told to report to HR.

148.158.      CEO Sossi had directed Ms. Lockett to terminate Ms. Cantwell's employment.

149.159.      Ms. Lockett informed Ms. Cantwell that she needed to pack her things and leave the GCC campus immediately.

150.160.      On her way to her car from the building, Ms. Cantwell texted Tommy Bryant, a GCC charge, and told him to get Oliva out of GCC because she was giving the kids drugs and having sexual relationships with them.

151.161.      Only after Ms. Cantwell's termination did GCC prohibit Oliva from taking residents on walks by herself.

152.162.      Despite the multiple alarm bells raised by Ms. Cantwell, GCC refused to conduct any meaningful investigation, failed to conduct any monitoring or supervision of Oliva whatsoever, and refused to report the allegations to law enforcement as required by Colorado law.

153.163.      Despite having knowledge of Oliva's relationships with boys under her authority, GCC refused to remove her from her position, allowing her to continue her perverse and violative conduct with D.B., G.H. and likely many other kids.

154.164.      Upon information and belief, other than Oliva, GCC was aware of multiple other female staff having relationships with residents.

## VIII.IX.   STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 20 U.S.C. § 1681, et seq. – Title IX
### (All Plaintiffs Against Defendant GCC)

155.165.      Plaintiffs hereby incorporate all other paragraphs of this complaint as if fully stated herein.

156.166.      Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

157.167.      At all relevant times, Defendant GCC received federal financial assistance.

158.168.      Oliva subjected Plaintiffs to sexual abuse and harassment that was so severe, pervasive, and objectively offensive that it deprived Plaintiffs of access to educational opportunities or benefits provided by the school.

159.169.      Defendant GCC and its officials had actual knowledge that Oliva posed a substantial risk of abuse to the students at GCC.

160.170.      GCC possessed the authority to take corrective action to end the discrimination.

161.171.      By failing to adequately investigate, discipline, supervise, or take any remedial steps after receiving actual knowledge that Oliva posed a substantial risk of abuse to students, Defendant GCC's response to that knowledge was clearly unreasonable in light of the known circumstances.

162.172.      By failing to take immediate, effective remedial steps to resolve the sexual abuse and harassment by Oliva, Defendant GCC exhibited deliberate indifference to the sexual abuse and sexual harassment experienced by Plaintiffs.

163.173.    Defendant GCC's failure to respond to the sexual harassment promptly and appropriately, resulted in Plaintiffs, on the basis of their sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in GCC's education program in violation of Title IX.

164.174.    As a direct result of Defendant GCC's unlawful conduct, Plaintiffs sustained actual physical, emotional, and economic injuries in an amount to be proven at trial.

165.175.    Plaintiffs have been and continue to be damaged by Defendant GCC's violation of Title IX.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Substantive Due Process – Bodily Integrity**
**(All Plaintiffs Against all Defendants)**

166.176.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

167.177.    Plaintiffs' substantive due process claim is brought under the Fourteenth Amendment to the United States Constitution through 42 U.S.C. § 1983.

168.178.    The Fourteenth Amendment recognizes a substantive due process component that protects life, liberty, or property interests against government actions regardless of the fairness of the procedures. *Daniels v. Williams*, 474 U.S. 327 (1986).

179.    Defendant GCC is liable under 42 U.S.C. § 1983 because it is a state actor.

180.    Defendant GCC is a state actor because it fulfills the public function of juvenile detention, detainment, commitment, and rehabilitation. *See Nugent v. Spectrum Juv. Just. Servs.*, 72 F.4th 135, 143 (6th Cir. 2023).

169. 181.     When private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations.  *Skelton v. Pri-Cor, Inc*., 963 F.2d 100, 102 (6th Cir. 1991) (private corporation operating a detention center is "no doubt performing a public function traditionally reserved to the state").

182.     Involuntary detention is an exercise of power that is traditionally and exclusively reserved to the state.

183.     Defendant GCC contracts with the state to house children who are court-ordered to be held at its facilities.

184.     GCC is endowed with state powers because the children are not free to leave. *See West V. Atkins*, 487 U.S. 42 (1988) (private physician contracted by the state to provide medical services to inmates acts under color of law when treating inmates.")

185.     Defendant GCC does not merely care for the troubled youth placed at its facility, but rather offers a "correctional setting" designed to remove children "from the community." *Nugent v. Spectrum Juv. Just. Servs*., 72 F.4th 135, 142 (6th Cir. 2023).

186.     Courts have routinely found that juvenile style detention/ correctional facilities like GCC are state actors for the purposes of § 1983. *See Rosborough v Mgt & Training Corp*, 350 F.3d 459, 461 (5th Cir. 2003); *George v Pacific-CSC Work Furlough*, 91 F.3d 1227, 1230 (9th Cir. 1996); *Smith v Cochran*, 339 F.3d 1205, 1215-16 (10th Cir. 2003).

170. 187.     Oliva's employment required her to perform the services for which the State contracted with GCC.

171.188.      The claims against Defendant GCC directly relate to the core of the service for which GCC was contracted by the State of Colorado, which was to provide a variety of services related to supervising, caring for, treating, and rehabilitating children in the custody of the State.

172.189.      Additionally, Plaintiffs' involuntary placement at GCC is indicative of GCC's State actor status. *See Milonas v. Williams*, 691 F.2d 931 (10th Cir. 1982).

173.190.      At all relevant times, Defendant Sossi was acting under the color of state law in her capacity as CEO of GCC.

174.191.      By her actions and inactions described herein, Defendant Sossi subjected Plaintiffs to the deprivation of rights, privileges, or immunities secured by the Constitution and laws. In particular, as students under the care of a federally funded institution, Plaintiffs have a liberty interest in personal security, bodily integrity, and freedom from the infliction of sexual abuse.

175.192.      Oliva subjected Plaintiffs to severe and pervasive sexual abuse, resulting in significant emotional and physical harm to Plaintiffs.

176.193.      Oliva engaged in such sexual abuse with malicious intent and without any legitimate penological or educational purpose.

177.194.      Oliva's conduct was objectively unreasonable, willful, and wanton, outrageous, and shocking to the conscience.

178.195.      As Oliva's employer, Defendant Sossi was provided with notice that Oliva was sexually abusing Plaintiffs.

179.196.      Not only did Defendant Sossi fail to take any action to prevent further sexual abuse, but she fired Ms. Cantwell for bringing the issue to her attention. As a result, Oliva was permitted to continue her abuse of Plaintiffs.

180.197.      Defendant Sossi's failure to protect Plaintiffs from the substantial risk of abuse posed by Oliva was objectively unreasonable.

181.198.      The actions and omissions in which Defendant Sossi engaged in were pursuant to the customs, policies, and practices of GCC.

182.199.      Defendant GCC was deliberately indifferent to the constitutional rights of its students, including Plaintiffs, by failing to properly train, monitor, supervise, and discipline its employees with respect to the sexual abuse or molestation, investigation of allegations of student abuse, social media contact between staff and students, and mandatory reporting duties under Colorado law. Defendant GCC could and should have pursued reasonable methods of training, monitoring, supervising, and disciplining its employees.

183.200.      Defendant GCC's failure to, in its supervisory duties, adequately train, supervise, and discipline its employees with respect to sexual abuse or molestation, investigation of allegations of student abuse, social media contact between staff and students, and mandatory reporting duties under Colorado law was a custom, policy, or practice of GCC and a driving force behind the constitutional violations described herein.

184.201.      GCC's acts and omissions were the legal and proximate cause of Plaintiffs' damages.



185.202.      As a direct result of Defendants' unconstitutional conduct, Plaintiffs sustained actual physical, emotional, and economic injuries in an amount to be proven at trial.

186.203.      As a result of Defendant Sossi's intentional conduct, Plaintiffs are entitled to punitive damages in an amount sufficient to punish Defendant Sossi and to deter others from like conduct.

187.204.      The conduct of Defendants violated Plaintiffs' clearly established liberty interests.

188.205.      Plaintiffs have been and continue to be damaged by Defendants' violation of their federally protected liberty interests.

### THIRD CLAIM FOR RELIEF
**C.R.S. § 13-20-1201**
**Actions for Sexual Misconduct Against Minors**
**(All Plaintiffs Against all Defendants)**

189.206.      Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if full set forth herein.

190.207.      Plaintiffs bring a separate claim for each occurrence of sexual abuse against Defendant GCC under C.R.S. § 13-20-1201 et. seq. arising out of each incident.

191.208.      At the time of the events described herein, Defendant GCC was a "managing organization" as defined in C.R.S. § 13-20-1201(4) which organized a youth-related activity or program which engaged the services of Oliva as an employee.

192.209.      Oliva was an employee and agent of Defendant GCC at all times pertinent hereto, and as such, was placed in a position of responsibility, trust, or supervision pursuant to C.R.S. § 13-20-1201.

193.210.      Oliva engaged in "a pattern of sexual misconduct" under C.R.S. § 13-20-1201(8) against the Plaintiffs.

194.211.      At the time of the sexual assaults, Oliva was acting within the course and scope of her employment with GCC.

195.212.      Despite actual and constructive notice of Oliva's misconduct and the risk posed by her, Defendants took no steps to remove Oliva from her position or protect the Plaintiffs from the harm perpetrated by Oliva.

196.213.      As a direct and proximate result of the actions and inactions of Defendant GCC, Plaintiffs have suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### C.R.S. § 13-21-115
### Premises Liability Act
### (All Plaintiffs Against all Defendants)

197.214.      Plaintiffs incorporates and re-alleges, by reference, all other paragraphs in this Complaint as if fully set forth herein.

198.215.      Defendants are legally responsible for the activities conducted or circumstances existing on the real property where Plaintiffs were sexually assaulted, and therefore is a "landowner" as defined by C.R.S. § 13-21-115(1).

199.216.      As someone ordered to reside at GCC, Plaintiffs were invitees as defined by C.R.S. § 13-21-115(5)(a).

200.217.      Defendants owed a statutory and non-delegable duty to Plaintiffs to exercise reasonable care to protect them and other residents against dangers and/or dangerous

activities of which Defendants knew or should have known.  C.R.S. § 13-21-115(3(c)(I).

~~201.~~218.        Defendants knew or should have known that an employee sexually abusing and assaulting a minor, was a dangerous activity on the premises and thereby created a hazardous and dangerous condition for the residents on the property.

~~202.~~219.        Defendants breached their duty to exercise reasonable care to protect Plaintiffs from dangers of which it knew or should have known by failing to ensure that the activities conducted on its property, including the activities of its employees, were safe and appropriate for the residents, this includes but is not limited to Defendants' failure to ensure that its employee Oliva was not sexually abusing and assaulting residents on the property.

~~203.~~220.        Defendants' failure to exercise reasonable care to protect Plaintiffs from dangers of which they knew or should have known by failing to ensure that its employees were not engaging in dangerous activities on the property, including but not limited to sexually abusing and assaulting minor residents, was unreasonable.

~~204.~~221.        Defendants' failure to exercise reasonable care to protect residents, including Plaintiffs, from dangers of which it knew or should have known was unreasonable, reckless, and careless.

~~205.~~222.        As a direct and proximate result of the actions and inactions of Defendants, Plaintiffs have suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**Negligence**
**(All Plaintiffs Against all Defendants)**



206.223.        Plaintiffs incorporates and re-alleges, by reference, all other paragraphs in this Complaint as if fully set forth herein.

207.224.        Defendants had a duty of care to protect its residents, including Plaintiffs, from persons that it knew or should have known to be a threat to GCC residents' safety.

208.225.        Defendants breached their duty of care to protect its residents, including Plaintiffs, by failing to ensure that its employees, including Oliva, did not pose a threat to the safety of its residents.

209.226.        As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

<u>SIXTH CLAIM FOR RELIEF</u>
**Negligent Infliction of Emotional Distress/ Outrageous Conduct**
**(All Plaintiffs Against all Defendants)**

210.227.        Plaintiffs incorporates and re-alleges, by reference, all other paragraphs in this Complaint as if fully set forth herein.

211.228.        Defendants engaged in reckless and negligent conduct.

212.229.        Defendants' reckless and negligent conduct created an unreasonable risk of harm to Plaintiffs.

213.230.        Plaintiffs suffered physical injuries and emotional trauma when Defendants' employee, Oliva, invaded their privacy and repeatedly sexually abused and assaulted them.

214.231.        Plaintiffs were in the zone of danger created by Defendants' actions and inactions.

215.232.      As a direct and proximate result of Defendants' actions and inactions, Plaintiffs have suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

## IX.X.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against each of the Defendants, and award them all relief allowed by law, including but not limited to the following:

A.   All appropriate relief at law and equity;

B.   Declaratory relief and other appropriate equitable relief;

C.   Economic losses on all claims as allowed by law;

D.   Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

E.   Punitive damages on all claims allowed by law and in an amount to be determined at trial;

F.   Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

G.   Pre-and post-judgment interest at the lawful rate; and

H.   Any other appropriate relief at law and equity that this court deems just and proper.

**PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED: May 3, 2024

RATHOD | MOHAMEDBHAI LLC

*s/ Azra Taslimi*
Azra Taslimi
Matthew J. Cron
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400 (t)
(303) 578-4401 (f)
at@rmlawyers.com
mc@rmlawyers.com

ATTORNEYS FOR PLAINTIFFS